128 Cal.Rptr.2d 714 (2002)
104 Cal.App.4th 1170
CITY OF ANAHEIM, Defendant and Appellant,
v.
Steven W. NOLAN, Plaintiff and Respondent.
No. G028272.
Court of Appeal, Fourth District, Division Three.
December 26, 2002.
*715 Grancell, Lebovitz, Stander, Marx and Barnes, Norin T. Grancell, Los Angeles, and Lawrence Kirk, Sacramento, for Defendant and Appellant.
Lemarie, Faunce, Pingel & Singer and Steven R. Pingel, Seal Beach, for Plaintiff and Respondent.

OPINION
SILLS, P.J.

I. INTRODUCTION
Peace officers and firefighters sometimes put in for a disability retirement based on "mental incapacity" where the alleged incapacity derives fundamentally from the fact that they aren't getting along with their colleagues. The "incapacity" is manifested in some fear about the way fellow officers will behave toward them in the future. (E.g., Haywood v. American River Fire Protection Dist. (1998) 67 Cal. App.4th 1292, 1296, 79 Cal.Rptr.2d 749 [firefighter with history of disciplinary *716 problems claimed entitlement to disability retirement because of fear that he would be treated unfairly if he returned to work].)
The present case involves such an officer. However, in determining whether the officer was mentally incapacitated, the trial judge applied the wrong standard. The trial judge assumed that it was enough that the officer feared retaliation from his former colleagues in the Anaheim Police Department.
That is not the standard. Fear arising out of a fear of retaliation by individuals in one department does not translate into an incapacity that keeps an officer from working elsewhere. The relevant statute, Government Code section 21156, uses the phrase "state service," not "city" or "department" service. It is thus directed at the inability to perform one's usual duties, i.e., one's usual services, not to work smoothly in a given location with specific people. We reject as a matter of law the demeaning but unspoken stereotypical assumption on which these "fear of retaliation" cases are based, i.e., that because of a "code of silence," most peace officers and firefighters throughout the state are really bad guys who would not come to the aid of a colleague who was on the "outs" with the rest of a specific department.

II. BACKGROUND

A. Events Leading Up to the Superior Court Hearing

Steven W. Nolan began his employment as a police officer with the City of Anaheim in 1984. He was number one in his sheriffs academy class. Professionally things went well for him in the late 1980's. His work reviews were "stellar."
Then in 1991 he moved to the gang unit. There he encountered trouble with his colleagues when he reported what he believed to be excessive use of force on detainees by fellow officers.[1] He began to experience "strained relations" with other members of his unit. He voluntarily left the gang unit, returning to patrol duty in July 1992.
An internal affairs investigation turned up no misconduct on the part of the other officers. Disciplinary charges were then brought against Nolan in December 1992 for violating a variety of department rules, including unbecoming conduct, unsatisfactory performance, misuse of sick time, improper handling of evidence and unauthorized erasure of some 53 tape recordings of statements made by witnesses, victims and suspects.
The most serious of these charges was the erasure of the tapes, and Nolan was fired for it in March 1993. He took the case to arbitration, in a case financed by his fellow officers through the Anaheim Police Association. The arbitrator decided that Nolan did not merit firing, but still imposed a five-day suspension on him.
Nolan never returned to work. Instead, in September 1994, at the age of 32, he filed for a permanent disability retirement, having received two threatening telephone calls and numerous telephone call hang-ups after the arbitrator's decision came down. Nolan believed the calls were placed by Anaheim police officers. In one of the two non-hang-ups he was told to always wear his vestan allusion to being shot at. The other was: "Welcome back, you're f-ing dead."
Nolan saw several mental health professionals. He also filed a civil "whistleblower" *717 suit seeking damages for wrongful termination. The jury in the whistleblower suit agreed with Nolan and awarded him $223,000, but also concluded that he could have worked at comparable employment, and so reduced the award by $63,000. The jury also gave him $180,000 in compensation for emotional stress. Nolan used a portion of the award to open a restaurant.
In April 1999, an administrative hearing on Nolan's disability retirement was held. By October the administrative law judge recommended denial of the request, concluding that "Nolan's problems fall more within the administrative than the psychiatric area." The administrative law judge found that Nolan suffered no "mental illness." Rather, Nolan's "unhappiness and feelings of frustration represent the normal emotional responses to anyone placed in an unpleasant situation." Anaheim adopted the administrative law judge's proposed decision in December 1999. Nolan filed this case in March 2000, seeking a writ of mandamus compelling the city to grant him the disability retirement.

B. The Evidence Before the Superior Court

As was the case at the administrative hearing, the evidence before the trial court on the writ proceeding consisted of reports from several mental health professionals. Those reports consisted of: (1) several reports from a psychologist referred to Nolan by his attorney, covering the period November 1994 through October 1995; (2) two reports from a psychiatrist hired by the city from January and March 1995; and (3) a report from psychiatrist hired by the city's insurer dated June 1995.

1. Nolan's Own Psychologist's Reports
The main theme in the reports of Nolan's own psychologist was an almost existential disillusionment with police work. In the March 1995 report the psychologist wrote: "When asked if he could work as a police officer again, the patient said, `Maybe in a perfect world. I'm too disrespectful of police departments at this time after I've see what really goes on, and I know I wouldn't get hired if they knew my background. I have no tolerance for the political shit and unjustices all the time. It's hard to keep my mouth shut.'" From such remarks the psychologist concluded: "Based on my examinations and treatment of Mr. Nolan, it is my opinion he remains demonstrably distressed pursuant to his tenure with the City of Anaheim. The patient continues to struggle with an overwhelming sense of helpless[ness] in the face of shattered assumptions about the world as meaningful, comprehensible and orderly, and that he may be the victim of overpowering forces beyond his control." The psychologist diagnosed him as suffering from "Major Depression, single episode." However, the psychologist did not recommend either medication or even regular psychoanalysis. Nolan would only "require as-needed psychotherapeutic treatment for symptom relief if subject to occupational demands outside of the limitations mentioned above."[2]
*718 According to his own psychologist's report, Nolan was quite functional in daily living. He lived just outside of Orange County with his then-fiancee who worked as the manager of a check cashing agency, with his fiancees six-year-old son and the couple's three-year-old daughter. A typical day would see him get up, help his children get ready for school, baby-sit his daughter through the middle and late morning hours while reading the paper and cleaning house, then work around the house or run errands in the middle to late afternoon. His psychologist noted that he "leaves the house without difficulty and drives without psychiatric impairment." He would make phone calls "`just fine'" and spend the early evening hours "working on the computer" after his fiancee would come home. He had "future interests" including "learning catering and cooking for friends' parties." And he socialized with his friends "when he play[ed] golf," though he did not socialize "with anyone from the Anaheim Police Department."
In October 1995, Nolan's psychologist wrote one other report, a "psychological re-evaluation" which occurred after a disturbing incident in September 1995. At the time the O.J. Simpson criminal trial was in full dudgeon. A police officer, Mark Fuhrman, was very much in the news, and a local radio talk show was having a discussion on the question of the so-called police "code of silence." (We will have our own comments on that topic in part III.B of this opinion below.) Nolan had by then married his fiancee and she called into the show; Nolan's then-attorney eventually came on the line and had "a very emotional and powerful conversation with both the show's host and several callers." The next day his wife was driving to work on the freeway in the late afternoon when a red car followed her closely from behind, then pulled into her blind spot, and then someone shot out her right rear passenger window. The red car sped past her without her being able to get the license plate. The psychologist noted that the incident made Nolan feel "`more paranoid.'"

2. The City's Psychiatrist's Reports
The city's psychiatrist was (as one might now guess) considerably less sympathetic with Nolan. As with his own psychologist, Nolan expressed his worry that, in light of the complaints he had made about the use of force on detainees and the fact that those complaints had not been treated confidentially, he had been placed "in the position of being a snitch." The city's psychiatrist found that Nolan was "a very angry person," which was not surprising given that Nolan saw the psychiatrist as a representative of the police department. Thus Nolan was "not going to discuss anything that might compromise his case." However, a review of Nolan's records showed him to be "quite competent in law enforcement," though he had difficulties taking orders (he had no difficulties giving them). The city's psychiatrist, interestingly enough, found Nolan's concerns about not receiving the support of his fellow officers and thereby having his safety jeopardized to be "realistic." Those concerns, however, were properly classified as administrative; they were not going to be "resolved by sitting in a psychologist's office."
The city's psychologist also disputed the conclusion that Nolan suffered a major depression. In a major depression, there is withdrawal, apathy, markedly diminished interest or pleasure in all activities, *719 diminished ability to think and concentrate, and indecisiveness. Nolan, by contrast, successfully carried on an appeal of his termination, participated in his defense, performed the "activities of daily living independently, effectively and appropriately," took care of his own daughter andeven though sexual functioning is usually one of the first things to go in a depressive illnesshad no sexual problems. Most of those things had been noted by Nolan's own psychologist, but the city's psychiatrist drew a different conclusion: Nolan didn't suffer from a major depression because "[h]is level of functioning is too good." His "predominant affect" was one of "anger rather than depression," something which was apparent to even the most casual observer and was reflected in his psychological test results.

3. The City's Insurer's Psychiatrist's Report
The city's insurer's psychiatric evaluation was, in his own words, "more consistent" with that of Nolan's own psychologist. The city's insurer's psychiatrist reported that Nolan was experiencing "irritability, liability of mood [sic] and extreme anger, memory loss characterized by poor recall of all events, depression, and lack of motivation." He had "difficulty falling asleep" and was unable "to participate in recreational activities." Apparently Nolan had not told the city's psychologist about his golfing with his non-Anaheim Police Department friends.
Then again, in stating that Nolan's "affect was anxious and appropriate in mood, and moderately depressed," the same report said there "was no evidence of formal thought disorder" and in fact Nolan's thoughts were "free-flowing and expressed in a lucid manner, relevant, and appropriate. There were no perceptual disturbances including hallucinations or delusions noted.... He did not display loosening of associations, ideas of reference, or tangentiality, but was extremely circumstantial in describing" his "adverse experiences and mistreatment at the hands of the Anaheim Police Department."
Nolan's obsession with his mistreatment formed the basis of his conclusion that his "level of functioning appears to be significantly impaired by his current symptomatology as evidenced by his difficulties with extreme level of ruminative thought and concentration." That is, in plainer English, "it was noted that during the interview that he was really unable to discuss any other topics besides his recent experiences involving the Anaheim Police Department." The bottom line was that Nolan "had suffered from depression for quite some time and remains at least moderately depressed at the present time." The insurer's psychiatrist gave as his diagnosis, "major depression, single episode, severe." In concluding that his depression would affect his work, the insurer's psychiatrist returned to Nolan's obsession with his mistreatment: "he is extremely somatically preoccupied and experiencing ruminative thoughts which would interfere with his level of daily functioning."

4. The Trial Judge's Decision
In the words of the trial judge, the dispositive fact was that the city's insurer's psychiatrist "concurred basically right down the line" with Nolan's psychologist that "Nolan is not emotionally and mentally able to work as a police officer due to fear for his personal safety and retaliation he has already experienced, per the APA newsletter, and is likely to continue to experience and the likelihood that he could not count on fellow officers for backup in time of need."
*720 The retaliation in the APA newsletter to which the trial judge referred was an article written by the president of the Anaheim Police Association in the wake of Nolan's decision not to return to work and to file a whistleblower suit after the association had financed the arbitration action in an effort to get him his job back. Essentially, the association had sided with Nolan because its members thought he shouldn't have been fired for not maintaining the evidence tapes, since there was no official policy that required it. Much of the column was directed at the president's exasperation with the lawyers hired by the association who had turned the arbitration into a "crusade" and made Nolan into a whistleblower, and the general thrust of the article is that Nolan had betrayed the association by filing the civil whistleblower suit: "What we have found is a man who effectively spit in our faces once we helped him out. If all he wanted to do was sue and get a `big settlement' why did we all have to get him his job back? Why didn't he just sue?"
The passage to which the trial judge referred came after a few more remarks about the attorneys (who were certainly not going to get any more business from the association). We will quote the lead-in sentences, so the context is clear: "I regret the day we ever got involved in this deal. [The two attorneys] will never be recommended by this Police Association for anything. Steve Nolan can go to hell (probably shouldn't say that; he'll report that he is being threatened) but he can go there anyway. Steve, if you want your job back (per the Chief) it is still here but I won't work with you. I guess we'll all see you in court."
The trial judge reasoned that both the arbitration and civil whistleblower suit had determined that police department did not have sufficient reason to terminate him and that the termination was "in retaliation for his informing on fellow officers suspected of using illegal force on suspects." The judge specifically noted that "even Dr. Schwarz has stated that Nolan's fears are reasonable and might be rooted in reality, and Nolan's record will follow him to any other law enforcement position he may seek."
And at that point, the trial judge concluded with his own analysis, which centered not on depression qua depression, but fear. "In this particular line of work, it is more than just an administrative problem when an officer cannot feel safe with fellow officers and cannot rely upon them for backup in an emergency. Nolan's fears along this line, according to Dr. Winter [Nolan's psychologist], make it emotionally and mentally, although not physically, impossible for Nolan to return to law enforcement."
The trial court entered a judgment in October 2000 commanding the city to find Nolan, then age 38, permanently incapacitated and award him disability retirement benefits retroactive to the date of his last regular compensation. Anaheim now appeals.

III. DISCUSSION

A. General Principles

The Public Employees' Retirement Law (Gov.Code, § 20000 et seq.) makes certain employees, basically police officers and firefighters, eligible for special disability retirement benefits if they are incapacitated in the performance of duty as a result of an "industrial" disability.[3] (See *721 § 21151; see generally Pearl v. Workers' Comp. Appeals Bd. (2001) 26 Cal.4th 189, 193, 109 Cal.Rptr.2d 308, 26 P.3d 1044.)[4]
There are two controlling statutes: Section 21156 and section 20026. Section 21156 sets up the basic structure of the law. If the officer is mentally or physically incapacitated, he or she shall be retired from duty. Section 21156 reads in pertinent part: "If the medical examination and other available information show ... that the member is incapacitated physically or mentally for the performance of his or her duties in the state service ... the board shall immediately retire him or her for disability."
Section 20026 adds the important statutory gloss of reasonable permanence to the idea of what it is to be "incapacitated physically or mentally." Section 20026 reads in pertinent part: "`Disability' and `incapacity for performance of duty' as a basis of retirement, mean disability of permanent or extended and uncertain duration." (Emphasis added.)
Additionally, there is a common law gloss on the idea of incapacity, namely that incapacity is "`the substantial inability of the applicant to perform his usual duties.'" (Hosford v. Board of Administration (1978) 77 Cal.App.3d 854, 860, 143 Cal.Rptr. 760, quoting Mansperger v. Public Employees' Retirement System (1970) 6 Cal.App.3d 873, 876, 86 Cal.Rptr. 450, Hosford court's emphasis.) (Below we address the question, not hitherto explored, as to whether the test of "usual" duties is based on the nature of services performed or specific personal interactions within a given department.)
*722 There seems to be little doubt that disability retirement cases are governed by what is called in administrative law the "independent judgment" standard, that is, the trial court exercises its own independent judgment on the administrative record. (See Quintana v. Board of Administration (1976) 54 Cal.App.3d 1018, 1023-1024, 127 Cal.Rptr. 11 [highway patrol officer who had been injured in auto accident in line of duty "had a fundamental vested right to a disability retirement pension if he in fact was disabled," therefore trial court was to exercise "independent judgment upon the weight of the evidence"].) However, as made clear by our high court in Fukuda v. City of Angels (1999) 20 Cal.4th 805, 817, 85 Cal.Rptr.2d 696, 977 P.2d 693, in exercising that judgment, the trial court "must afford a strong presumption of correctness concerning the administrative findings." Moreover, it is the party challenging the administrative finding who "bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (Ibid.)
At the appellate level, Fukuda teaches that there is essentially a two-step standard. First step: If the trial court has misplaced the burden of proof, say, by putting it on the prevailing party at the administrative level, or has failed to accord the administrative findings a presumption of correctness, the appropriate course is to reverse the judgment of the trial court and send the case back to the trial court to see what the trial court would do if it applied the correct standards. (Fukuda, supra, 20 Cal.4th at pp. 824-825, 85 Cal.Rptr.2d 696, 977 P.2d 693.) However, if there has been no such error by the trial court, the appellate court then goes to step two, which is to review the trial court's decision under the substantial evidence standard. (Id. at p. 824, 85 Cal.Rptr.2d 696, 977 P.2d 693.)
In the present case, we may skip step one. There is nothing affirmative in the record which suggests that the trial court misplaced the burden, or otherwise failed to accord the administrative result a presumption of correctness. In the absence of such an affirmative "smoking gun," it would seem that the general presumption of the correctness of trial court judgments should controlit would hardly do to reverse merely because the trial judge forgot to intone that, while he used his independent judgment, he had still accorded the administrative findings a presumption of correctness. Other than the outcome itself, nothing suggests that the trial judge didn't follow the rules stated in Fukuda. The question then becomes, under Fukuda, a question of substantial evidence. However, in this case there is the threshhold question of the proper legal standard by which to measure the substantiality of the evidence. Specifically, the parties are in sharp disagreement as to whether an applicant need merely show incapacity to work in his or her last department, or rather must show incapacity to do such work in a similar department throughout the state, which is a legal issue.

B. Fear Confined to a Specific Department Is Not Incapacity For "State Service"

Section 21156 requires that the claimant be physically or mentally incapacitated from performing "duties in the state service."[5] We conclude that by using this *723 language, the Legislature showed that the test is a lack of capacity to work in a similar position elsewhere in the state, not merely the lack of capacity to work in a given department with the particular personalities in that department.[6]
On the simplest level, the conclusion is required by the plain language of the statute. Section 21156 does not say "the employee's `last employing department.'" It says "state" service.
On a deeper level, however, it is a conclusion also required by existing case law. When we actually examine what happened in the cases which have addressed the issue of "usual duties," it is clear that the phrase (with the singular exception of the law of light duty assignments, which we will also discuss below), as a matter of the common law of this state, refers to the nature of services usually rendered, not any work in a given department. Ironically, those are the very cases that Nolan relies on to assert the opposite proposition.
Mansperger v. Public Employees' Retirement System, supra, 6 Cal.App.3d 873, 86 Cal. Rptr. 450 was the first case to construe what incapacity for "performance of duty" meant (which was in the context of section 21156's predecessor statute, former section 21022). The Mansperger court denied a disability pension to a fish and game warden who sustained injuries to his right arm.
First, the Mansperger court imported from Massachusetts the idea that "incapacitated for the performance of duty" meant the "the substantial inability of the applicant to perform his usual duties." (Mansperger, supra, 6 Cal.App.3d at p. 876, 86 Cal.Rptr. 450, relying on Quincy Retirement Board v. Contributory Retirement Appeal Board (1959) 340 Mass. 56, 162 N.E.2d 802.) Then the court reasoned that even though the claimant could not do much in the way of heavy lifting, heavy lifting is only a "remote occurrence" in a fish and game warden's job. Nor were occasions to arrest people. Accordingly, the claimant could carry out the "normal duties of a fish and game warden" and therefore the trial court properly denied his petition to compel a disability retirement. *724 (See Mansperger, supra, 6 Cal. App.3d at pp. 876-877, 86 Cal.Rptr. 450.)
The Mansperger court, with the innocence of a tribunal confronting statutory language for the first time, did not insinuate any notion of departmental localism. The words "incapacitated" and "duty" had an obvious connection to the generic kind of services that an employee might perform, not the specific individuals they might be performed with. The case turned on heavy lifting, and the nature of a fish and game warden's work.
Craver v. City of Los Angeles (1974) 42 Cal.App.3d 76, 117 Cal.Rptr. 534 is to the same effect. In Craver, a police officer injured his back lifting a small car in the line of duty. Most of the opinion is dicta, because the trial court had not used the independent judgment test, and therefore the case had to be sent back to the trial court for it to exercise its independent judgment for the first time. (See id. at pp. 78-79, 117 Cal.Rptr. 534.) In comments for the benefit of the trial court on remand, the court addressed the issue of the availability of "permanent light duty assignments" and simply said that where there are such assignments, a claimant "should not be retired if he can perform duties in a given permanent assignment within the department." (Id. at pp. 79-80, 117 Cal.Rptr. 534.) The court then observedswitching back to a generic, rather than specific contextthat such a claimant "need not be able to perform any and all duties performed by firemen, or, in the instant case, policemen." (Id. at p. 80, 117 Cal.Rptr. 534, emphasis added.) If a person can be "employed in such an assignment," meaning a light duty assignment within the department, "he should not be retired with payment of a disability retirement pension." (Ibid.)
Craver's reference to "within the department" was clearly in the context of what might be called the "law of light duty assignments." That is, the availability of a permanent light duty assignment within the claimant's department obviously precludes eligibility for a disability retirement pension. (Accord Barber v. Retirement Board (1971) 18 Cal.App.3d 273, 278, 95 Cal.Rptr. 657; O'Toole v. Retirement Board (1983) 139 Cal.App.3d 600, 605, 188 Cal.Rptr. 853.)
At this point we must digress on the subject of light duty assignments, because the best argument that can be made for Nolan's position for a departmentally-specific interpretation of "usual duties" rests there. That is, if, as in Craver, the court looks to the particular department where the claimant was last employed to determine whether it has a "permanent light duty" assignment available, wouldn't it be anomalous to test mental incapacity on the basis of the claimant's ability to perform his usual duties outside the last department where he was employed?
The answer to that is no. The salient point is that the law of light duty assignments is itself an exception to the Mansperger rule that incapacity is tested by looking to the claimant's "usual duties." A "light duty" assignment is one that would allow the claimant to continue working, but not working at his or her "usual duties." By definition a light duty assignment is "unusual" duty.
Barber v. Retirement Board, supra, 18 Cal.App.3d 273, 95 Cal.Rptr. 657, the first case after Mansperger to employ the idea of a permanent light duty alternative shows that the law is based on what is reasonable in that precise context, not a rule that courts should always look to the department when interpreting the word "duties" outside the context of permanent light duty assignments. Ironically, Barber arose in a context where the officer didn't *725 want to retire. Instead he wanted to keep on working.
Herman Barber was a real trouper as a firefighter. When he lost his right leg while working as a hoseman, he returned to work as a hoseman with an artificial leg. He was quite active: He was not only an avid skier, but a ski instructor. He also rode horses for recreation. He wanted to be a lieutenant in the department. He was found medically qualified, but the fire chief didn't believe so; the fire chief couldn't imagine that someone with an artificial leg might be capable of jumping across a lightwell or going down a gable. The fire chief thought retirement was the "dignified" solution, but Barber fought it. (See Barber, supra, 18 Cal.App.3d at pp. 274-277, 95 Cal.Rptr. 657.)
The fire chief prevailed before the city, the trial court, and eventually in the appellate court as well, but not without some dicta on the part of the appellate court that formed the kernel from which the law of light duty assignments comes. Basically, the appellate court agreed with Barber's contention that the chief had incorrectly construed "his duty" as used in the city charter to mean "any and all duties that are performed by firemen." (Barber, supra, 18 Cal.App.3d at p. 278, 95 Cal. Rptr. 657, original emphasis removed.) Rather, the court looked to the "well recognized public policy favoring the employment and utilization of physically handicapped persons" to declare that "[u]nder the circumstances, where there were permanent light duty assignments," a "narrower construction" of the words his duty "would be more reasonable." (Ibid.) Barber then went on to lose the case because all the light duty assignments were filled.
O'Toole v. Retirement, supra, 139 Cal. App.3d 600, 188 Cal.Rptr. 853, like Barber, did not purport to say anything beyond the context of what is plainly reasonable when permanent light duty assignments are available by the officer's last employing department. There, an officer who suffered a "bilateral inner ear injury" was able to work for six and one-half years as a public affairs officer and, as a practical matter, could have continued in that position indefinitely. The appellate court simply didn't buy the idea that the department's "paper policy" to the effect that there were no permanent limited duty positions was substantial evidence that there were no permanent limited duty positions in reality. (See id. at p. 605, 188 Cal.Rptr. 853.)
Stuessel v. City of Glendale (1983) 141 Cal.App.3d 1047, 1052, 190 Cal.Rptr. 773 would later read Barber, Craver and O'Toole together to form what that court concluded was the "wise[ ] modification]" of the usual duty test set forth in Mansperger.
In sum, the "usual duties" rule has been, as Stuessel noted, "wisely modified" to express a public policy ultimately rooted, as shown in Barber, in the desirability of employing disabled people. So there is no anomaly. There is simply the general rule (usual duties) when the availability of a permanent light duty assignment is not an issue, and an exception to that general rule (looking to whether there is a permanent light duty position as distinct from an officer's "usual" duties) when the availability of a light duty alternative is an issue. Indeed, it would turn the public policy reason for light duty assignment law on its head to use to it establish un employability based on a distaste for working in a particular department.
The third case that Nolan reads for the proposition that the law looks just to one department is Thelander v. City of El Monte (1983) 147 Cal.App.3d 736, 195 Cal. Rptr. 318. Thelander arose out injuries incurred by a newly hired officer who was *726 going to the police academy. When she was hired the city knew she had "asymptomatic" scoliosis. That scoliosis quickly became very symptomatic when she began an exercise regime at the academy. (See id. at p. 740, 195 Cal.Rptr. 318.) There was no question that the officer was "physically incapable of completing" her program at the academy. There were no light duty assignments available, so the trial court ruled that she was entitled to a disability pension. (Id. at pp. 741-742, 195 Cal.Rptr. 318.)
In affirming, the appellate court reviewed the physically strenuous acts that "a field officer"and the court said nothing about any difference between an El Monte field officer and some other city's field officermight perform. And, consistent with its review of these acts, the Thelander court's discussion appeared under a major topic heading stating that the officer "was incapacitated to perform the duties of a police officer."
However, in a minor topic heading,[7] the Thelander court restated its conclusion by saying that the officer was "physically incapable of performing the required duties of an El Monte police officer." (Id. at p. 742, 195 Cal.Rptr. 318.) Also, after listing a series of such physical acts (subduing, running, climbing, jumping, crawling, breaking up fights and dragging or carrying victims) that the officer couldn't perform, the court then added that there was "additional evidence in this record to support a finding" that the officer was "physically incapable of performing the usual full field duties of an El Monte police officer." (Id. at p. 743, 195 Cal.Rptr. 318.)
It is these offhand references to "El Monte police officer" that Nolan relies on here. But it is apparent from the context and content of what the Thelander court was saying that those were mere stylistic flourishes, meant at most to remind the reader that the officer in question had already been accepted by the El Monte police department despite her known scoliosis.
What is undeniable about Thelander is that its rationale was pegged to the nature of the services performed (or to be precise, the nature of the services that would be performed after completion of training), not the El Monte police department. The description of the physical acts which the officer couldn't do had nothing to do with El Monte. Subduing, climbing, jumping, crawling, breaking up fights and moving victims are things officers must perform throughout the state. Nor was the "additional evidence" to which the court referred specific to El Monte. It consisted of the warnings of several doctors to the officer not to engage in physically strenuous work of any kind, and presumably anywhere. (Thelander, supra, 147 Cal. App.3d at p. 742,195 Cal.Rptr. 318.)
In the case before us, the trial judge only obliquely alluded to the possibility of employment in another police department, when he said, "Nolan's record will follow him to any other law enforcement position he may seek." It is a cryptic comment that bears some elucidation.
First, to the degree that it was intended to mean that Nolan might not be able to obtain employment elsewhere, it is irrelevant to the case. We must distinguish between two separate things, which can be easily confusedthe likelihood of finding employment elsewhere in the state and the capacity to do the work if such employment were found. A minor theme of Nolan's *727 paperwork has been that his reputation will follow him around like a scarlet letter or a brand upon a shoulder, and therefore it is unlikely that any other police department will hire him. That may or may not be the case, and while it is a plausible proposition,[8] it doesn't bear on mental capacity as such.
Second, to the degree that it was intended to predict Nolan's inability to function in a police department other than in Anaheim based on a future reaction, the comment reflects an untenable stereotype of police officers generally, namely that they engage in a "code of silence." The "code of silence" is a stereotype of police officers in which most police officers are presumed to be bad guys in the sense that they will cover up wrongdoing in the department even to the point of exposing a fellow officer to harm.
Now, the stereotype of the "code of silence" is not without some empirical support. The story of Frank Serpico who testified against corruption in the New York Police Department and was later reportedly shot by his own colleagues during a drug raid still has a hold on the popular imagination. (E.g., Gilles, Breaking the Code of Silence: Rediscovering "Custom" in Section 1983 Municipal Liability (2000) 80 B.U. L.Rev. 17, 76 ["While Al Pacino fans may recall `Serpico' for its protagonist's triumphant testimony before the Knapp Commission on police corruption, generations of NYPD officers will better remember Frank Serpico for the bullet he received in the back of the head during a Brooklyn drug raidreportedly by the very same colleagues he had `ratted' on to the commission"].) And scholars have identified its operation in general terms. (See Comment, To Serve and Protect or to Betray and Neglect?: The LAPD and Undocumented Immigrants, 49 U.C.L.A. L.Rev. 1611, 1631, fn. 101 ["Bayley has found the code of silence to be a common problem in police departments, and he attributes it to the adversarial relationship which he finds develops between officers and management within most police departments"]; see e.g., Diesel v. Town of Lewisboro (2d Cir.2000) 232 F.3d 92 [officer who cooperated with internal affairs investigation was himself subjected to excessive drunk driving investigation].)
But what the stereotype really boils down to in the context of the case before us is this casual assumption, made without critical analysis: Most police officers in this state will behave badly toward Nolan if he were ever hired to work as a police officer in their department.
The assumption is untenable, for two reasons. First, as a legal matter, if there are any applicable legal presumptions concerning the anticipated behavior of police officers, it is that they will do the right thing, not the wrong. (Civ.Code, § 3548.) Second, as a factual matter, there is no evidence in the record that officers in other departments pose any sort of danger to Nolan, or even that he feared they would. Nothing except stereotyping indicates that the rank and file officers in any hypothetical police department which might hire Nolan would even be informed of his alleged "snitching" on the gang unit, much less that those officers would invariably retaliate against him for something done a long time ago in a department far away. Nor is there anything to indicate that police *728 management could not either (a) keep the information from leaking out or (b) not protect Nolan if it did.
Finally, to the degree that the comment may have reflected the adoption of the trial court of the appropriate "state service" standard (as distinct from a "department service standard") the trial court's application of that standard was, as we have just shown, contaminated by the code of silence stereotype.

IV. DISPOSITION
In any event, it appears that the trial judge used either the wrong standard, or the right standard warped in the light of the code of silence stereotype. We must therefore reverse the judgment and remand the case for a re-review of the administrative record under the right standard to determine whether Nolan has met that standard. That standard is: whether Nolan is mentally incapacitated for state service, i.e., perform police services throughout the state, absent implicit considerations based on the theory that police officers in departments other than Anaheim will be assumed to want to retaliate against him for what happened in Anaheim.
Because the complexity of the issues and the lack of direct precedent, in the interests of justice each side will bear its own costs on appeal.
WE CONCUR: RYLAARSDAM and MOORE, JJ.
NOTES
[1] As Nolan described these incidents, there clearly was "excessive force." However, we use the tentative locution "what he believed to be excessive use" because a subsequent investigation did not corroborate the charges.
[2] The "limitations" to which the psychologist referred were apparently some eight "factors of disability" and Nolan's relative impairment in each category. Of the eight, the psychologist reported that Nolan suffered no impairment at all in two categories: his ability to comprehend and follow instructions, and his ability to perform simple and repetitive tasks. In two of the other categories, there was only "slight impairment": the ability to relate to others beyond the giving or receiving of instructions and in the ability to make generalizations, evaluations or decisions without immediate supervision. The remaining categories showed only "slight to moderate" impairment: ability to maintain a work pace appropriate to a given work load, ability to perform complex and varied tasks, ability to effectively influence people, and ability to accept and carry out responsibility for direction, control and planning. In no category did Nolan's psychologist describe any impairment that was "moderate" or greater.
[3] All statutory references in this opinion unless otherwise expressly noted are to the Government Code.
[4] As the Pearl case points out, the retirement law is distinct from the workers' compensation system, involving different statutes, different governing boards, and a "limited class of employees, like police and firefighters, whose employment subjects them to hazardous working conditions." (See Pearl, supra, 26 Cal.4th 189, 198, 109 Cal.Rptr.2d 308, 26 P.3d 1044.) In neither of the two cases from our Supreme Court where a peace officer requested a disability retirement based on mental incapacity, Pearl and Traub v. Board of Retirement (1983) 34 Cal.3d 793, 195 Cal. Rptr. 681, 670 P.2d 335, was the court required to delve too deeply into the nature of mental incapacity itself. In Pearl, a state university police officer was subjected by his supervisor and other officers to the sort of things that would ordinarily form the basis of a claim for intentional infliction of emotional distress: He was the brunt of a series of cruel practical jokes, including being falsely informed that he was the subject of an internal affairs investigation and having a packet of firecrackers set off in a toilet stall he was in. On top of that his brother murdered his sister-in-law and then committed suicide, and the officer went through his own divorce and custody dispute. (Pearl, supra, 26 Cal.4th at pp. 191-192, 109 Cal.Rptr.2d 308, 26 P.3d 1044.) The issue which the Supreme Court addressed was whether a Public Employees' Retirement System statute or a workers' compensation statute determined whether the injury was "industrial" in character.

Likewise, the focus in Traub was question of whether the injury was "service-connected." (See Traub, supra, 34 Cal.3d at p. 797, [195 Cal.Rptr. 681, 670 P.2d 335].) The officer there had been the subject of an internal investigation in which he had been alleged to have negotiated a sale of drugs to an undercover agent, and the stress of the investigation had caused the "psychiatric disability." There was no reason to explore the nature of "psychiatric disability" because the board accepted the proposition that the officer was disabled, it simply did not agree that the disability was service-connected. The focus of the case was the trial court's (erroneous as it turned out) reasoning that because the object of the investigation was "illegal activity outside the scope of employment" the stress caused by the investigation itself was not "service-connected." (Id. at p. 799, 195 Cal. Rptr. 681, 670 P.2d 335.) Wrong, said our high court: If the charges had been sustained that might have been the case. But since the charges were "not proved," all the stress was job-related; any other result would have been illogical. (Id. at pp. 799-800, 195 Cal.Rptr. 681, 670 P.2d 335.)
[5] Section 20069 sets forth a definition of "state service," but it is a definition that doesn't directly address any discrepancy that might arise because an employee would be capable of doing his or her job in one location but not in another. The focus of section 20069 is on who exactly is covered by the retirement statutes, not what usual duties are. Section 20069 provides in its entirety: "(a) `State service' means service rendered as an employee or officer (employed, appointed or elected) of the state, the university, a school employer, or a contracting agency, for compensation, and only while he or she is receiving compensation from that employer therefor, except as provided in Article 4 (commencing with Section 20990) of Chapter 11.[¶] (b) `State service,' solely for purposes of qualification for benefits and retirement allowances under this system, shall also include service rendered as an officer or employee of a county if the salary for the service constitutes compensation earnable by a member of this system under Section 20638."

However, to the degree that the statute gives a hint, the statute obviously is consistent with a reading of "state service" that means "state service," not "department service." The enumeration in the statute ("employee or officer (employed, appointed or elected) of the state, the university, a school employer, or a contracting agency, for compensation") are all things that are done throughout the state though by different departments. Thus an officer who first works at UCI and then later transfers to Berkeley is clearly in "state service" in both jobs.
[6] It is matter of first impression because, given the common law usual duty test, "state service" and "last employing department" are not likely to be different when it comes to physical disabilities. Writing a traffic ticket isn't too much different in Anaheim than it is in Bellflower. A bad shoulder will hinder your ability to pull an accident victim out of a car whether you work for the El Monte Police Department or the Sacramento Police Department. Psychological disability claims, by contrast, may sometimes implicate the specific personalities with whom one works, and those do vary from department to department.
[7] As do we in this opinion, the Thelander court found it convenient to use an outline format to present its opinion. The major topic heading was Roman numeral II, the minor topic heading was capital A.
[8] Though it isn't as intuitive a proposition as it might appear on first blush, because management might very well want someone like Nolan, who presumably was willing to report excessive force before it turns into an embarrassing police brutality action. For example, Nolan has never attempted to demonstrate that he wouldn't be perfectly suited for a job in internal affairs in a department outside of Anaheim.