[Civ. No. 16717. Third Dist. Feb. 3, 1978.]

HORACE G. HOSFORD, Plaintiff and Appellant, v.
BOARD OF ADMINISTRATION OF THE PUBLIC
EMPLOYEES' RETIREMENT SYSTEM et al.,
Defendants and Respondents.

## COUNSEL

Johnson & Vinson, Drew M. Johnson and John W. Ewing for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Jeffrey L. Gunther, Deputy Attorney General, for Defendants and Respondents.

## OPINION

PARAS, J.—This is an appeal from a judgment of the Superior Court of Sacramento County denying a California Highway Patrol sergeant's petition for writ of mandamus. The petition sought to compel the Board of Administration of the Public Employees' Retirement System (Board) to set aside its decision denying a disability retirement under section 21020 et seq. of the Government Code.

Plaintiff Horace G. Hosford was employed by the California Highway Patrol as a state traffic officer from August 1965 to October 1968, and as a state traffic sergeant from October 1968 to August 1974; by reason of such employment he was a member of the Public Employees' Retirement System. On November 7, 1968, in an off-duty automobile accident, Hosford suffered fractures of the left ankle, left humerus, right heel, right femur, and fourth lumbar vertebra; he also received a severe laceration of the forehead and internal injuries to the pancreas. He was off work for eight months. On October 31, 1969, he was helping with a rescue during work hours when he twisted his left ankle and left knee, causing a loss of work for one and one-half months. He subsequently returned and carried out all his required duties.

On July 16, 1973, Hosford attempted to lift an unconscious victim of a motorcycle accident from the pavement and suffered a strain of his low back, superimposed upon the healed fracture at the fourth lumbar vertebra and upon a congenital vertebral joint instability at the fifth lumbar vertebra (spondylolysis). He was seen by Dr. T. C. Werner, who gave him a release to return to work on July 30, 1973, but for limited duty with no lifting.

On August 6, 1973, because of persistent pain, he was examined by Dr. S. A. Gaal who described the condition as a soft ligamentous tissue strain. He stated that because of the pre-existing deformities of the low back area Hosford was subject to recurrent ligamentous strains and should avoid activities involving sudden twisting, bending or lifting. Gaal prescribed stretch exercises and heat. He did not anticipate any permanent deformities or loss of function.

On August 17, 1973, Dr. Virgil Airola, an orthopedic surgeon, examined Hosford and suggested use of a back brace, stating he had sustained a strain of the back superimposed on the old compression fracture of L4 and the spondylolysis of L5. Airola followed him thereafter and gave him an unconditional release to return to work as of October 15, 1973, but to return to Airola in six weeks. Plaintiff returned to work on October 15, 1973, but did not report to Airola until February 4, 1974; he then stated that he was working regularly but was uncomfortable in the low back. He said he was able to bend, but was "sick of being uncomfortable."

Because of the continuing complaints, Airola referred him to Dr. Howard Black, a neurosurgeon, who examined him on March 8, 1974. Black reported no nerve root involvement. He stated the pain would indicate aggravation of the pre-existing spondylolysis, and that the spondylolysis and compression fracture were orthopedic and not neurological problems. Hosford discussed Black's report with Airola on March 22, 1974. In his report, Airola noted that Hosford "continues to complain of pain in the back, ankle and shoulder," and "[s]ince working this year, he has had three instances where he has had to overpower persons who resisted arrest, and he feels that this has produced additional strain, or at least places him in a position of jeopardy as far as his back and ankle are concerned." Airola added, "The patient is now going to law school, and I therefore suggest a possible retirement for him. He was provided with an excuse to remain off work beginning March 8, 1974, and he was provided with an excuse on this date (March 22) to run indefinitely. In other

words, the patient is apparently not physically able at this time to maintain the rigors of a Highway Patrolman's job. No active treatment is indicated at this time. He was advised to return only if indicated. No further appointments have been made for Mr. Hosford."

On March 13, 1974, Dr. Coleman Citret reported that Hosford was temporarily partially disabled with regard to work requiring prolonged sitting, riding, heavy lifting, repeated bending, and stooping. Later on, as of May 15, 1974, Citret thought Hosford's disability limited him permanently to light work.

Hosford testified that he received a 55 percent disability rating from the Workers' Compensation Appeals Board. He has not worked actively for the highway patrol since March 8, 1974. He left state service on August 16, 1974.[1] On October 29, 1974, he filed a timely application for disability retirement. (Gov. Code, § 21024, subd. (c).)

The Board required Hosford to be examined by Dr. W. Porter Forcade, M.D., an orthopedic specialist, in San Francisco. In addition to his examinations Forcade read all of the doctors' reports summarized above and concluded, in his own report of April 8, 1975, that Hosford is capable of carrying out the duties of a state·traffic sergeant "as they have been submitted to me."

An administrative hearing was held on August 6, 1975. Forcade testified that although Hosford had some disability, he could perform the functions listed in the State Personnel Board's job description for state traffic sergeants. He also felt that Hosford could perform the more strenuous functions listed in a highway patrol document titled "Typical Physical Demands on State Traffic Officers and Sergeants."

Hosford presented the testimony of two physicians at the hearing, neither of them orthopedists. Dr. Allen C. Hassan, whose specialty was family practice (with three years post-graduate study in psychiatry), testified that he felt Hosford was *not* able to perform the tasks listed in the highway patrol's "Typical Physical Demands." He further testified that the *fear of further injury* was itself disabling. On cross-examination,

---

[1] This court recently affirmed plaintiff's dismissal from the highway patrol on August 16, 1974 for inefficiency, inexcusable neglect of duty, insubordination and willful disobedience. (See *Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302 [141 Cal.Rptr. 354].) The fact of plaintiff's dismissal was not made known to the board or to the superior court, and has had no effect upon our decision.

he stated that "It is possible that he could perform the duties the first time and not be injured, that's obvious."

Dr. John Hollingsworth, an emergency room physician and Hosford's former family physician, examined Hosford for the purpose of testifying; he testified that Hosford was unable to perform "a majority" of the duties listed in the "Typical Physical Demands." He also testified that Hosford could not perform the duties listed in the State Personnel Board's job description.

On August 7, 1975, the hearing officer signed a proposed decision finding Hosford "physically and mentally incapacitated for substantial performance of his duties." The Board declined to accept the proposed decision, and on March 26, 1976, determined that "[t]he evidence failed to establish that [Hosford] is incapacitated for the performance of his duties as a State Traffic Officer pursuant to Government Code Sections 21025 and 21020."

On May 28, 1976, Hosford filed a petition for writ of mandamus in the superior court, pursuant to Code of Civil Procedure section 1094.5. After written and oral argument, the superior court on January 17, 1977, denied the petition. Applying its own independent judgment to the evidence, the court found that Hosford was "substantially able to perform the normal duties of a sergeant in the California Highway Patrol" and denied the petition.

I

The superior court properly used its own independent judgment in reviewing the Board's decision. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 45 [112 Cal.Rptr. 805, 520 P.2d 29]; *Craver* v. *City of Los Angeles* (1974) 42 Cal.App.3d 76, 79 [117 Cal.Rptr. 534].) Accordingly our review of the superior court's judgment is limited to determining whether there is substantial evidence to support it. (*Quintana* v. *Board of Administration* (1976) 54 Cal.App.3d 1018, 1024 [127 Cal.Rptr. 11].)

II

Both sides agree that the case of *Mansperger* v. *Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876 [83 Cal.Rptr. 450], states the applicable legal test of disability under Government Code section

21022: "We hold that to be 'incapacitated for the performance of duty' within Section 21022 means the *substantial* inability of the applicant to perform his *usual* duties." (*Mansperger, supra* at p. 876, italics added.)

The *Mansperger* case involved a fish and game warden who suffered injuries to his right arm. He was unable to lift heavy weights. Moreover, rowing a boat or apprehending prisoners could be accomplished only with difficulty. The warden's duties included serving warrants, making arrests, apprehending violators, seizing equipment used in violations, seizing fish and game illegally taken, removing dead animals by pushing them to the side of the road or putting them into pickup trucks, raising lobster traps, and rescuing people from the water by reaching over the sides of boats and assisting them into the boats. Additionally, it was required that a game warden be able to row a boat and swim 100 yards. Mansperger applied for disability retirement, and this was denied by the Public Employees' Retirement System. The decision was upheld by the Court of Appeal, which noted that the activities Mansperger was unable to perform were not *common occurrences* and that he "could substantially carry out the normal duties" required by the job. (*Mansperger v. Public Employees' Retirement System, supra,* 6 Cal.App.3d at pp. 876-877.)

We reject both the Attorney General's contention that plaintiff's "usual duties" are to be determined exclusively by use of the job description prepared by the State Personnel Board, and Hosford's contrary contention that the document titled "Typical Physical Demands on the State Traffic Officers and Sergeants" prepared by the highway patrol is the exclusive standard. There is no irreconcilable conflict between the two documents. Obviously, although the Personnel Board's job description does not expressly state that a sergeant should be physically able to make arrests and subdue prisoners, his exposure to such activity is implied from the fact that he supervises traffic officers who perform such functions. By the same token, although sergeants are lumped together with traffic officers in the "Typical Physical Demands" document, it is apparent from the evidence that the supervisory nature of their work makes such physical demands upon sergeants much less frequent than upon traffic officers.

This is consistent with the testimony at the hearing. William R. Yager, disability and retirement coordinator with the highway patrol, testified that the "Typical Physical Demands" document was *not* the standard used by the highway patrol when evaluating whether an officer or

sergeant can perform the functions required of him, but that "it describes the *exposure* of officers and sergeants." (Italics added.)

Lieutenant Jerry L. Workman testified that teaching enforcement techniques or physical methods of arrest might include bending to handcuff a person, but that such activity was infrequent: "I was a field sergeant three and a half years, and I taught handcuffing once." Concerning lifting a person off the road in connection with investigation of a motor vehicle accident, he testified that that type of activity would be "very infrequent." He stated that as a sergeant he had never been involved in a fight. Workman's testimony can best be summed up by the following:

"A. Normally enforcement is a secondary duty of a sergeant; his primary responsibility is supervision, and in particular field supervision, and to a large extent he can pick and choose the stops he makes. The Department does expect, if you observe a violation, to take some action, but there is some leeway there with the sergeant, since *he is not evaluated on the enforcement activities he produces.*

"Q. Am I correct in characterizing it that a sergeant's job, as the Highway Patrol views it, is to primarily supervise traffic officers rather than to constantly perform the duties associated with a traffic officer's job?

"A. Yes, sir.

"Q. And the physical demands on a traffic officer, would you say that those are more than the physical demands on a State traffic sergeant?

"A. Yes, sir.

"Q. To a great degree more?

"A. Yes, sir." (Italics added.)

Testimony by Yager with regard to a statistical study prepared at his direction showed that in the four-month period of the study *not one* custodial arrest was made by any of the California Highway Patrol's 535 sergeants. Yager explained this result in the following testimony: "Sergeants don't arrest people very often either because they are not exposed to it or because somebody else is there to perform the arrest."

## III

■ The superior court found that Hosford was "substantially able to perform the normal duties of a sergeant in the California Highway Patrol." Hosford contends that this finding is based heavily upon Forcade's opinion and that such opinion cannot constitute substantial evidence because "Dr. Forcade's conclusion on the ultimate issue did not match his testimony concerning [plaintiff's] physical limitations and ability to perform physical demands associated with road patrol."

In particular, Hosford points to Forcade's testimony that Hosford could sit for long periods of time but it would "probably bother his back;" that he could run but not very adequately and that he would probably limp if he had to run because he has a bad ankle; that he could apprehend persons escaping on foot over rough terrain or around and over obstacles but he would have difficulty and he might hurt his back; and that he could make physical effort from the sedentary state but he would have to limber up a bit. Hosford concludes that "Dr. Forcade's testimony is akin to a statement that an object which has wings, feathers, a bill and quacks is a camel."

We cannot agree. As the *Mansperger* court enunciated, Hosford is not disabled unless he is substantially unable to perform the usual duties of the job. The fact that sitting for long periods of time in a patrol car would "probably bother his back," does not mean that in fact he cannot so sit; and of course he can stop and exercise as needed. Workman testified that because of office work, "As a general rule, if a sergeant got half his time in the field, he is very lucky." Furthermore, Hosford himself testified at the time of the hearing that he was driving to law school twice a week, a two-hour round trip, plus sitting for an hour to two and a half hours in class each time, and did "a lot" of sitting while studying.

As for the more strenuous activities, Forcade testified that Hosford could run, and could apprehend a person escaping over rough terrain. Physical abilities differ, even for officers without previous injuries. The rarity of the necessity for such strenuous activity, coupled with the fact that Hosford could actually perform the function, renders Forcade's conclusion well within reason.

Hosford argues that the "Typical Physical Demands" document requires that he be able to perform these functions "safely and effectively." Both terms are highly subjective. Even officers in top

physical condition may suffer injuries in performing these tasks, and effectiveness certainly cannot be equated with brute strength. Each officer must be expected to have an awareness of his own limitations in facing emergency situations.

Significantly, we note that even Hosford's expert, Hassan, while concentrating most of his testimony on the *risks* of further injury, appeared at one point to concede that Hosford was *presently* capable of performing such strenuous activities:

"Q. Is it possible for [Hosford] to perform the duties which are listed on [the "Typical Physical Demands" document] . . . and not be injured?

"A. It is possible that he could perform the duties the first time and not be injured, that's obvious . . . ."

Finally, we note that Hosford refers several times in his briefs to the fact, as stated in Airola's report, that since he went back to work after the last injury, "he has had three instances where he has had to overpower persons who resisted arrest, and he feels that this has produced additional strain, or at least places him in a position of jeopardy as far as his back and ankle are concerned." Since Hosford has never made a formal claim of injury in connection with these incidents, we have little choice but to conclude that they actually represent further evidence of his ability to perform the more strenuous aspects of his work.[2]

## IV

■ Throughout the hearing, and again in his briefs, Hosford relied and relies heavily on the fact that his condition increases his chances for further injury. As the Board correctly points out, however, this assertion does little more than demonstrate that his claimed disability is only prospective (and speculative), not presently in existence. Through Hassan, Hosford attempted nonetheless to show that his *fear* of further injury was *mentally* disabling. He urges on appeal that Hassan's unrebutted testimony on this issue compels reversal of the judgment.

Again we disagree. " 'While it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted by the court as proof of the fact, this rule has its

---

[2]Because of our conclusion on this issue, we need not consider whether permanent "light duty" positions are available in the highway patrol.

exceptions. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statement . . . .' " (*Snell* v. *Telehala* (1969) 274 Cal.App.2d 61, 67 [78 Cal.Rptr. 780], citing *Davis* v. *Judson* (1910) 159 Cal. 121, 128 [113 P. 147].)

Hassan testified as follows: "The theory behind fear is that one subconsciously takes on all kinds of thoughts and ideas every day, some of which infer death or injury, and some of which are good and positive. Possibly the positive one is going to win out. When you grow up you hear about spinal injuries, patrolmen hear about spinal injuries. There are all these thoughts occurring to one at least on the subconscious level. In your daily work you think about this, and your subconscious says, 'There is something I should not do, because I have heard, and this is also conscious. It may be psychiatric theory, but it's valid. The subconscious says, 'I have heard of spinal injury, I have heard of impotence, I have heard of losing urine function, I have heard that you cannot work' and all of these things build up into a fear syndrome. The mature man takes those into account and protects himself from what he has heard, some of which is fact and some of which is fantasy. Some of those things bring caution to all our lives.

"Q. (Mr. Ewing): And in Sgt. Hosford's case you feel this is a disabling factor?

"A. (Witness): I do."

This testimony is not acceptable. It is nonsense to state that a "mature man" who exercises "caution" because he believes (quite rationally according to Hassan's other testimony) that he is susceptible to spinal injury, is thereby *mentally* disabled. Indeed, the opposite is true—one who does *not* behave cautiously has a mental problem.

Elsewhere, Hassan testified as to Hosford's mental state that "I think mentally he is fine." Moreover, Hassan never personally asked Hosford whether he had any fear:

"A. You don't personally ask a subconscious kind of thing. It has to be elicited through three ways.

"HEARING OFFICER: Well, couldn't it be a perfectly conscious fear, too?

"WITNESS: It could be. But if you were to tap the subconscious you have to allow dream interpretation—"

Hassan testified that his total examination of Hosford lasted about 45 minutes. Although Hassan was never asked whether he used any methods to probe Hosford's unconscious, it appears highly unlikely that he did since he also conducted a physical examination involving a number of physical tests. At any rate, he never testified that the fears were *actually* unconscious, and gave no indication that Hosford's fears were anything other than the mature, rational fears that keep people within their physical limitations. Such fears, as a matter of law, cannot be considered mentally disabling. Hassan's contrary testimony was correctly rejected by the trial judge.

## V

In view of our conclusion that the two job descriptions are not in conflict, the superior court did not err in failing to make a specific finding as to Hosford's "usual" duties. The trial court was not required to make separate findings as to physical and mental disability, inasmuch as negative findings on both points are necessarily implied from the court's finding on the ultimate fact of disability (*Bley* v. *Ad-Art, Inc.* (1967) 250 Cal.App.2d 700, 712 [59 Cal.Rptr. 26]). The court's finding that Hosford was "substantially able to perform the normal duties of a sergeant in the California Highway Patrol" also necessarily implies that the court's judgment did not depend on the possibility of a "light duty" assignment. Accordingly, no further finding was necessary on this point.

There is substantial evidence to support the trial court's judgment, which therefore is affirmed.

Puglia, P. J., and Janes, J., concurred.

A petition for a rehearing was denied February 27, 1978, and appellant's petition for a hearing by the Supreme Court was denied March 30, 1978. Bird, C.J., did not participate therein.