[No. S113359. July 1, 2004.]

STEVEN W. NOLAN, Plaintiff and Respondent, v.
CITY OF ANAHEIM, Defendant and Appellant.

COUNSEL

Grancell, Lebovitz, Stander, Marx and Barnes, Grancell, Lebovitz; Barnes and Reubens, Norin T. Grancell and Lawrence Kirk for Defendant and Appellant.

Lemarie, Faunce, Pingel & Singer, Law Office of Steven R. Pingel, Steven R. Pingel; Faunce, Singer & Oatman, Edward L. Faunce and Larry J. Roberts for Plaintiff and Respondent.

Peter H. Mixon, Carol McConnell and Richard B. Maness for California Public Employees Retirement Association as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

**BROWN, J.**—Plaintiff Steven W. Nolan was a police officer for the City of Anaheim (Anaheim); his last assignment was as a patrol officer. Pursuant to Government Code section 21156,[1] Mr. Nolan has applied for permanent disability retirement benefits on the ground that threats and harassment by other Anaheim officers have rendered him "incapacitated physically or mentally for the performance of his . . . duties *in the state service.*" (Italics added.) The question presented is what, for the purposes of section 21156, is meant by "state service"?

 "State service," Mr. Nolan contends, refers to the applicant's *last employer.* Therefore, Mr. Nolan argues, in order to qualify for disability retirement, he need only show he is incapable of continuing to perform his duties as a patrol officer for Anaheim. We disagree. We conclude that in order to qualify for disability retirement under section 21156, Mr. Nolan will have to show not only that he is incapacitated from performing his usual duties for Anaheim, but also that he is incapacitated from performing the usual duties of a patrol officer for other California law enforcement agencies. Assuming Mr. Nolan makes such a prima facie showing, the burden will then shift to Anaheim to show not only that Mr. Nolan *is* capable of performing the usual duties of a patrol officer for other California law enforcement agencies, but also to show that similar positions with other California law enforcement agencies are *available* to Mr. Nolan. By *similar* positions, we mean patrol officer positions with reasonably comparable pay, benefits, and promotional opportunities.

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Nolan began work as a police officer with Anaheim in 1984. He was number one in his sheriff's academy class and received outstanding ratings early in his career. In 1991, upon transferring to the gang unit, Mr. Nolan reported what he believed to be excessive use of force by fellow officers. As an apparent consequence, Mr. Nolan experienced strained relations with other members of the gang unit, and he voluntarily returned to patrol duty in 1992.

Five months later, after an internal affairs investigation failed to substantiate any misconduct on the part of the other officers, disciplinary charges were brought against Mr. Nolan for violation of department rules. The charges included unbecoming conduct, unsatisfactory performance, misuse of sick time, and improper handling of evidence. Mr. Nolan was fired, and he took the case to arbitration. The arbitrator ordered him reinstated, but suspended for five days.

Shortly after the arbitration, Mr. Nolan received two threatening telephone calls and numerous telephone hang-ups. He believed the calls were placed by Anaheim police officers. One caller warned him to always wear his vest, an apparent allusion to being shot at, and the other said, "Welcome back, you're fucking dead." As a consequence, Mr. Nolan filed for disability retirement; he also filed a civil "whistleblower" suit seeking damages for wrongful termination.

In the whistleblower suit, the jury awarded Mr. Nolan $223,000 for the wrongful termination, but reduced the award by $63,000 on the ground he could have found comparable employment. In addition, the jury awarded Mr. Nolan $180,000 for emotional stress.

In this disability matter, the administrative law judge found that Mr. Nolan suffered no mental incapacity and recommended denial of his request. Anaheim adopted the decision, and Mr. Nolan filed this action, seeking a writ of mandamus to compel the city to grant him disability retirement.

The superior court found that Mr. Nolan was permanently incapacitated for the performance of his duties as a police officer for Anaheim. The court based its finding on the testimony of a psychologist retained by Mr. Nolan, concurred in by a psychiatrist retained by the city's insurance carrier, that he was not emotionally and mentally able to work as a police officer due to his fear for his personal safety and the retaliation he had already experienced.[2]

---

[2] No issue is raised in this case as to whether section 21151 covers psychiatric incapacity resulting from conflicts with fellow employees. Previously, we have assumed it does. (See *Pearl v. Workers' Comp. Appeals Bd.* (2001) 26 Cal.4th 189, 191 [109 Cal.Rptr.2d 308, 26

The court further found that Mr. Nolan's fear of retaliation was based, in part, on the likelihood that he could not count on fellow officers for backup in time of need. The court noted that his posttermination arbitration proceeding and his civil whistleblower suit had established that the police department did not have sufficient reason to terminate him and that the termination was in retaliation for his informing on fellow officers he believed used illegal force on suspects. The court further noted that even the psychiatrist retained by the city stated that Mr. Nolan's fears were reasonable.

The Court of Appeal reversed and remanded the cause for reconsideration of the administrative record under what it held to be the appropriate standard, i.e., "whether Mr. Nolan is mentally incapacitated for state service, i.e., perform police services throughout the state . . . ."

We affirm the judgment of the Court of Appeal, which reversed the judgment of the trial court, and we remand the matter for further proceedings consistent with this opinion.

## II. DISCUSSION

The rules governing statutory construction are well settled. We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. (*People v. Trevino* (2001) 26 Cal.4th 237, 240 [109 Cal.Rptr.2d 567, 27 P.3d 283]; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) To determine legislative intent, we turn first to the words of the statute, giving them their usual and ordinary meaning. (*Trevino*, at p. 241; *Trope v. Katz* (1995) 11 Cal.4th 274, 280 [45 Cal.Rptr.2d 241, 902 P.2d 259].) When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 744 [38 Cal.Rptr.2d 650, 889 P.2d 970]; *People v. Woodhead* (1987) 43 Cal.3d 1002, 1007–1008 [239 Cal.Rptr. 656, 741 P.2d 154].)

The statutory context of this case was recently summarized in *Pearl, supra,* 26 Cal.4th 189. "The Legislature enacted the Public Employees' Retirement Law (Gov. Code § 20000 et seq.), 'to effect economy and efficiency in the public service by providing a means whereby employees who become

---

P.3d 1044] (*Pearl*) [disability claim "alleging cumulative workplace trauma . . . including psychiatric injury caused by a series of incidents involving other officers and [applicant's] supervisor"].)

superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees, and to that end provide a retirement system consisting of retirement compensation and death benefits.' (*Id.* § 20001.) Under its provisions, certain persons, including police officers, are eligible for special disability retirement benefits if they are 'incapacitated for the performance of duty as the result of an *industrial* disability.' (*Id.* § 21151, italics added.) Thus, upon retirement for such a disability, a peace officer 'shall receive a disability allowance of 50 percent of his or her final compensation plus an annuity purchased with his or her accumulated additional contributions, if any, or, if qualified for service retirement, the member shall receive his or her service retirement allowance if the allowance, after deducting the annuity, is greater.' (*Id.* § 21407.) These benefits are free from federal income taxes. (26 U.S.C. § 104(a)(1).)" (*Pearl*, at pp. 193–194.)

The provision of the Public Employees' Retirement Law (PERL) at issue here is section 21156, which provides for disability retirement for a member who is incapacitated physically or mentally for the performance of his or her duties *in the state service.* Section 21156 provides in pertinent part: "If the medical examination and other available information show to the satisfaction of the board, or in case of a local safety member, other than a school safety member, the governing body of the contracting agency employing the member, that the member is incapacitated physically or mentally for the performance of his or her duties in the state service and is eligible to retire for disability, the board shall immediately retire him or her for disability, unless the member is qualified to be retired for service and applies therefor prior to the effective date of his or her retirement for disability or within 30 days after the member is notified of his or her eligibility for retirement on account of disability, in which event the board shall retire the member for service."

Again, the question presented is what, for the purposes of section 21156, is meant by "state service"?

Mr. Nolan contends that for a police officer, i.e., "a local safety member," to demonstrate he or she is "incapacitated physically or mentally for the performance of his or her duties in the state service," the officer need only show an incapacity to continue functioning in "the contracting agency employing the member."

We disagree. As the Court of Appeal observed, section 21156 does not refer to the employee's *last employing department*; it refers to *state service.* Section 20069 defines "state service" as "service rendered as an . . . officer . . . of the state, the university, a school employer, or a contracting agency, for compensation . . . ." When sections 21156 and 20069 are read

together, it becomes clear that "state service," for the purposes of section 21156, means *all forms* of public agency service that render an employee eligible for the benefits of section 21156. Therefore, in order for Mr. Nolan to qualify for disability retirement under section 21156, he will not only have to show he is incapacitated from continuing to perform his usual duties for Anaheim, but also that he is incapacitated from performing the usual duties of a patrol officer for other California law enforcement agencies covered by the PERL.

The position taken by Mr. Nolan would lead to results that would clearly be at variance with the fundamental policies that led the Legislature to enact the PERL. As previously stated, the Legislature enacted the PERL *"to effect economy and efficiency in the public service* by providing a means whereby employees who become superannuated or otherwise incapacitated may, without hardship or prejudice, be replaced by more capable employees, and to that end provide a retirement system consisting of retirement compensation and death benefits." (§ 20001, italics added.) Mr. Nolan asserts that no other law enforcement agency in the state would be willing to hire him because he (1) has accused fellow officers of misconduct, (2) is perceived as a troublemaker for challenging his termination and bringing a whistleblower suit, and (3) has a history of anxiety, depression and fear. However, in response to questions at oral argument, Mr. Nolan's counsel also insisted that Mr. Nolan would be entitled to permanent disability retirement even if several police departments in communities surrounding Anaheim were to offer him positions that were in all relevant respects similar to the position he held in Anaheim, and his psychological disability did not extend to the other departments. We find it inconceivable that the Legislature, in enacting the PERL "to effect economy and efficiency in the public service," intended to grant an applicant permanent disability retirement benefits under such circumstances.

Mr. Nolan contends, however, that the granting of such a windfall is compelled by the body of case law that has developed in the Courts of Appeal regarding light duty assignments. As Mr. Nolan points out, under the light duty doctrine, a police officer is not considered to be incapacitated if a permanent light duty position the officer is capable of performing is available *within that department.* (See, e.g., *Barber v. Retirement Board* (1971) 18 Cal.App.3d 273 [95 Cal.Rptr. 657] (*Barber*); *Craver v. City of Los Angeles* (1974) 42 Cal.App.3d 76 [117 Cal.Rptr. 534] (*Craver*); *O'Toole v. Retirement Board* (1983) 139 Cal.App.3d 600 [188 Cal.Rptr. 853] (*O'Toole*).)

■ The light duty cases are distinguishable. The seminal light duty cases involved construction of disability retirement provisions of *city charters.* (*Barber, supra,* 18 Cal.App.3d at pp. 275–276 [San Francisco]; *Craver, supra,* 42 Cal.App.3d at p. 79 [Los Angeles]; *O'Toole, supra,* 139 Cal.App.3d

at p. 603 [San Francisco].) Therefore, the question addressed in each of those cases was whether the applicant was capable of filling a permanent light duty assignment that was available in the applicant's department.[3] Mr. Nolan has not brought to our attention, nor has our own research revealed, a light duty case addressing the relevance of the availability of appropriate light duty assignments in other cities. A decision, of course, does not stand for a proposition not considered by the court. (*People v. Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619].) Therefore, the light duty cases are simply not apposite.

In its brief, amicus curiae, the California Public Employees' Retirement System (CalPERS), warns that a standard of the sort we adopt today—that a peace officer seeking permanent disability retirement must show not only that he is incapacitated from performing his usual duties for his last employer, but also that he is incapacitated from performing the usual duties of his last assignment for other California law enforcement agencies—would not be *administrable*. Such a test would be impossible to administer, CalPERS contends, because "it requires assumptions about what services are required at other departments or employers other than at [the] City of Anaheim. While it may be possible to imagine some duties that other police departments require of police officers, uniform circumstances of employment around the state cannot be presumed."

■ CalPERS has set up a straw man. Doubtless, the duties required of, for example, patrol officers are not *uniform* throughout the state. However, that is beside the point. The question is: What are the *usual* duties of a patrol officer? (*Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873, 876–877 [86 Cal.Rptr. 450] (*Mansperger*).)

In *Mansperger*, the Court of Appeal was called upon to construe former section 21022. (Added by Stats. 1945, ch. 123, § 1, p. 599; repealed by Stats. 1995, ch. 379, § 1, p. 1955.) It provided: "Any patrol or local safety member *incapacitated for the performance of duty* as the result of an industrial disability shall be retired for disability, pursuant to this chapter, regardless of age or amount of service." (Italics added.) The *Mansperger* court held that "incapacitated for the performance of duty," for the purposes of former

---

[3] (See *Barber, supra,* 18 Cal.App.3d at p. 278 [section 171.1.3 of the San Francisco Charter was properly construed as referring to "*duties required to be performed in a given permanent assignment within the department*"]; *Craver, supra,* 42 Cal.App.3d at p. 80 ["The language of section 182 [of the Los Angeles Charter] indicates that the determination of disability and necessity of retirement is on a departmental basis rather than on that of a single job or a particular duty. The section refers to duties 'in such department' and to 'further service in such department' "]; *O'Toole, supra,* 139 Cal.App.3d at p. 602 ["The sole issue is whether there is substantial evidence to support the trial court's finding that there was no 'light duty' assignment in the [San Francisco] [P]olice [D]epartment available to O'Toole"].)

section 21022, meant *the substantial inability of the applicant to perform his* usual *duties.* (*Mansperger, supra,* 6 Cal.App.3d at p. 876.) The court acknowledged that the applicant, a state fish and game warden, could no longer lift or carry heavy objects, but observed the necessity for doing so was a "remote occurrence" in a fish and game warden's job. (*Id.* at pp. 876–877.) The court also acknowledged that fish and game wardens occasionally need to make physical arrests, but observed that such occasions were "not a common occurrence for a fish and game warden." (*Id.* at p. 877.) The evidence showed the applicant "could substantially carry out the normal duties of a fish and game warden." (*Id.* at p. 876.) Therefore, the court held, "the board, and the trial court, properly found that petitioner was not 'incapacitated for the performance of duty,' within the meaning of section 21022 of the Government Code and, therefore, that he was not entitled to the disability retirement which he sought." (*Id.* at p. 877.)

With all due respect to the expertise of CalPERS in administering the PERL, determining the usual duties of a patrol officer should not be that difficult. Every civil service employer must describe the usual duties of every position.

■ Finally, while the Legislature, in enacting the PERL, was concerned to "effect economy and efficiency in the public service," it expressly intended to do so "without hardship or prejudice" to "employees who become superannuated or otherwise incapacitated." (§ 20001.) To deny Mr. Nolan disability retirement benefits on the ground he is capable of working for other California law enforcement agencies would clearly work a hardship on him if, as he claims, no other law enforcement agency would, in fact, be willing to hire him because he has blown the whistle on misconduct by fellow officers. Therefore, if Mr. Nolan shows not only that he is incapacitated from performing his usual duties for Anaheim, but also that he is incapacitated from performing the usual duties of a patrol officer for other California law enforcement agencies, the burden will shift to Anaheim to show not only that Mr. Nolan is capable of performing the usual duties of a patrol officer for other California law enforcement agencies, but also that similar positions with other California law enforcement agencies are available to him.[4] By

---

[4] In his brief in the Court of Appeal, Mr. Nolan's counsel discussed bifurcation of the burden of proof. Mr. Nolan's primary position, of course, is that he should only be required to prove he is incapable of continuing to perform his duties as a patrol officer for Anaheim. However, his fallback position is that once he shows he is incapable of continuing to work as a patrol officer for Anaheim, the burden would shift to Anaheim to prove "the existence of suitable alternate employment opportunities."

At oral argument in this court, counsel for Anaheim was asked his views on the burden of proof. Counsel responded that if Mr. Nolan showed he was incapable of continuing to perform his usual duties for Anaheim, the burden would shift to Anaheim to show Mr. Nolan was not incapacitated from the performance of his usual duties elsewhere in the state. When asked

*similar* positions, we mean patrol officer positions with reasonably comparable pay, benefits, and promotional opportunities.

### III. Disposition

We affirm the judgment of the Court of Appeal reversing the judgment of the trial court; we remand the matter for further proceedings consistent with this decision.

George, C. J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring and Dissenting.—I agree with the majority opinion insofar as it rejects Mr. Nolan's argument that he can claim disability retirement benefits on the sole basis that he has become physically or psychologically incapacitated to work as a police officer *for the City of Anaheim.* On the contrary, he must show that his job-related physical or psychological condition prevents him from performing the *usual and customary duties* of a police officer *anywhere in the state.* And once he does present such evidence, the city must have an opportunity to rebut it.

But that is the end of the matter. If Mr. Nolan has a general job-related incapacity for police officer duties, he is entitled to a pension. Otherwise, he is not. The majority opinion thus errs in its holding that Mr. Nolan may retire for disability, even if he has no *general* incapacity, unless the city can show "that similar positions with other California law enforcement agencies are *available* to him." (Maj. opn., *ante*, at p. 344, fn. omitted, italics added.)

The majority's effort not to penalize Mr. Nolan for his "whistleblowing" activities is understandable, but it is an example of good intentions gone awry. The statutory scheme specifies that an eligible local safety member may be retired for disability if "the member is incapacitated *physically or mentally* for the performance of his or her duties in the state service" (Gov. Code, § 21156, italics added)[1] "as the result of an industrial disability" (§ 21151, subd. (a)). The statutes nowhere intimate that a disability pension is available to an officer who has a general physical and mental ability to perform, but simply cannot secure a position. Unemployability is not the same thing as incapacity. The disability retirement system is not an unemployment insurance system.

As sole support for the "available positions" theory it invents, the majority opinion cites section 20001. This statute declares that the purpose of the

whether Anaheim would have to show that a position elsewhere in the state was actually available to Mr. Nolan, Anaheim's counsel responded no, that the test should be capacity, not employability.

[1] All further unlabeled statutory references are to the Government Code.

pension system for public employees is to "effect economy and efficiency in the public service by providing a means whereby employees who become superannuated or otherwise incapacitated may, *without hardship or prejudice*, be replaced by more capable employees . . . ." (Italics added.) The majority opinion posits that to deny Mr. Nolan a pension when no similar positions are available would cause him hardship and prejudice.

But the retirement scheme is intended to ease "hardship or prejudice" only for those eligible employees who are no longer productive because they have become either "superannuated," or *"incapacitated"* by industrial injury (§ 20001, italics added; see also § 21151, subd. (a)), and "incapacitated" means *physically or mentally unable* to perform *anywhere in the state*, not just for a particular employer. Section 20001 affords no license to carve out a "hardship or prejudice" *exception* to the statutory requirement that a disability retiree be "incapacitated" by job-related injury.

The facts of Mr. Nolan's case may be sympathetic, but the rule proposed by the majority opinion presumably would apply in less compelling circumstances. Law enforcement work is stressful by nature, and serious job-related conflicts may routinely arise. As the Court of Appeal noted, "[p]eace officers and firefighters sometimes put in for a disability retirement based on 'mental incapacity' [which] derives fundamentally from the fact that they aren't getting along with their colleagues" and from "fear about the way fellow officers will behave toward them in the future." The concern arises that an officer whose difficulties with coworkers have made it psychologically impossible to continue *in that agency*, but not elsewhere, could receive lifetime disability benefits simply on evidence that other agencies would not wish to hire him, or that the job market was full. (But cf. *Haywood v. American River Fire Protection Dist.* (1998) 67 Cal.App.4th 1292, 1304–1307 [79 Cal.Rptr.2d 749] (*Haywood*) [disability retirement not intended for one simply *unwilling* to return to current agency because of personality conflicts after being terminated for nonmedical cause].)

Moreover, if entitlement to a disability pension depends on whether similar suitable employment is unavailable elsewhere, numerous complications of proof will be presented. If the issue is general unemployability, what evidence on that issue will suffice? If the issue is job availability, how broad an area must the search for other openings cover? At what moment, or over what period, must the unavailability exist? Such questions threaten to become the "tail that wags the dog" in proceedings to determine whether a locally, but not generally, incapacitated officer may retire for disability.

Of course, an eligible local safety member may do so if difficulties that arose with a particular employer have produced a *general psychological*

*incapacity* to perform the usual and customary duties of a peace officer, regardless of location. The line between "unable" and merely "unwilling" can be fine. (See *Haywood, supra,* 67 Cal.App.4th 1292 [79 Cal.Rptr.2d 749].) Nonetheless, if Mr. Nolan's Anaheim experience produced a genuine *personal fear,* so severe as to render him dysfunctional, that, wherever he went, his record would follow, and he would face unbearable ostracism, threats, and lack of backup at times of danger, I agree he may secure a disability pension.

Nothing in the Court of Appeal's disposition prevents Mr. Nolan from presenting such evidence on remand. Accordingly, I would affirm the judgment of the Court of Appeal.

**KENNARD, J.,** Dissenting.—California's Public Employees' Retirement System (PERS) manages the pension benefits provided to more than 1.2 million public employees, retirees, and their families under the Public Employee Retirement Law (PERL). (Gov. Code, § 20000 et seq.)[1] Steven W. Nolan, a police officer for the City of Anaheim, whose employees are members of PERS, applied for a disability retirement based on a mental disability—his depression and anxiety stemming from fear that he would be killed or injured for lack of backup by fellow officers were he to return to duty in the Anaheim Police Department. The majority holds that to qualify for disability retirement Nolan must show not only that he is incapacitated to perform his usual duties for the Anaheim Police Department, but also that his incapacity precludes him "from performing the usual duties of a patrol officer for other California law enforcement agencies." (Maj. opn., *ante,* at p. 344.) That holding subverts the clear intent of the Legislature, overrules some 30 years of PERS administrative practice and precedent, as well as court decisional law, and sketches a new and unworkable test of disability. Therefore, I cannot and do not join the majority.

## I.

After Steven Nolan graduated from the sheriff's academy at the top of his class, the City of Anaheim hired him in 1984. In 1991, he joined the gang investigative unit, but after observing instances of what he believed to be excessive force by fellow officers, in 1992 he sought and received a transfer back to patrol duty. When a department investigation failed to substantiate his allegations of misconduct by the gang unit officers, Nolan himself was charged with and found to have violated certain department rules, leading to his dismissal in 1993.

---

[1] All statutory references, unless otherwise noted, are to the Government Code.

In August 1994, an arbitrator reversed the dismissal and ordered Nolan's reinstatement. Soon Nolan began receiving anonymous calls threatening his life; and the President of the Anaheim Police Association warned him in the association's newsletter, "If you want your job back . . . it is still here but I won't work with you." Nolan's work-related depression led him to apply for disability retirement in September 1994.

An administrative law judge took evidence, and in October 1999 he denied Nolan's application, finding Nolan had failed to establish "his substantial inability to perform his usual duties" and therefore was not mentally incapacitated. The City of Anaheim adopted that decision.

Nolan petitioned the superior court for a writ of mandate. The court reviewed the administrative record, which included reports from three mental health professionals who had interviewed Nolan. Dr. William Winter, the only one to have seen Nolan repeatedly, concluded after the last interview that Nolan was suffering from anxiety disorder and could not return as a police officer with the City of Anaheim, or "with any other municipality in Southern California," but might be able to be a police officer in a distant state such as Illinois where "his problems with the City of Anaheim" were unlikely to catch up with him. Dr. Samuel Dey was of the view that Nolan was suffering from depression and as a result "his ability to function in the work setting would be significantly impaired." In the opinion of Dr. Melvin Schwartz, Nolan did "not have a psychiatric injury," although his fear of personal harm were he to return to work was "a realistic concern." The superior court found that Nolan's fears "make it emotionally and mentally, although not physically, impossible" for him "to return to law enforcement," and concluded that Nolan suffered a "permanent psychological disability." Accordingly, in October 2000 the court issued a writ directing the city to find Nolan "permanently incapacitated from working for the City of Anaheim," and thus entitled to disability retirement. The city appealed.

The Court of Appeal reversed, holding that the test was not whether Nolan could perform the duties of a police officer in Anaheim (the test used by the superior court), but whether he was incapacitated "to work in a similar position elsewhere in the state." It derived that test from language in section 21156 requiring physical or mental incapacity to perform "duties in the state service." We granted Nolan's petition for review to resolve the meaning of this statutory language.

## II.

The paramount goal in construing statutes is to ascertain the Legislature's intent. (*Palmer v. G.T.E California, Inc.* (2003) 30 Cal.4th 1265, 1271 [135

Cal.Rptr.2d 654, 70 P.3d 1067].) Because the words of the statute are the most reliable indication of that intent, the statutory language is the starting point. (*In re J.W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363]; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) If that language is clear and unambiguous, no further inquiry is called for. (*Ibid.*)

Here, the statutory language is clear and unambiguous. Section 20069 defines state service as "service rendered as an employee or officer . . . of the state, the university, a school employer, or a contracting agency, for compensation, and only while he or she is receiving compensation *from that employer* . . . ." (§ 20069, subd. (a), italics added.) The majority tellingly deletes the final three words from this sentence, thus altering the statutory meaning. (Maj. opn., *ante*, at p. 341.) Read in its entirety, the section provides that an employee renders state service to, and is paid by, a particular employer ("that employer"), whether the employer is the State of California, the University of California, a school employer, or one of various public entities that contract with PERS for employee coverage.

Section 21156, which governs disability retirement, provides: "If the medical examination and other available information show to the satisfaction of the [PERS Board of Administration], or in [the] case of a local safety member, other than a school safety member, the governing body of the contracting agency employing the member, that the member is *incapacitated* physically or mentally for the performance of his or her duties in *the* state service and is eligible to retire for disability, the board shall immediately retire him or her for disability . . . ." (§ 21156, italics added.) In plain language, the statute speaks not of incapacity for a job in statewide public service, but more narrowly of incapacity to perform the employee's "duties in *the* state service," that is, duties the employee performs for a particular public employer. This means that state service, as applied to an employee of an agency that has contracted for PERS coverage, pertains to the service for which the employee is paid by a particular agency.

The majority, however, construes the statutory term the "state service" to mean "*all forms* of public agency service that render an employee eligible" for disability retirement. (Maj. opn., *ante,* at p. 342.) Thus, it requires Nolan to show that he is incapacitated to perform not just his usual duties as a City of Anaheim patrol officer, but also that he is incapacitated to perform the "usual duties of a patrol officer" (maj. opn., *ante*, at p. 344) for any other California public agency that hires patrol officers. The majority does not suggest how a city police officer such as Nolan could possibly show that he could not perform the usual duties of a patrol officer for the wide array of potential California public employers, including the California Highway

Patrol, the University of California, numerous school employers, or an even greater number of localities and public agencies, because the usual duties of a patrol officer vary from agency to agency.

## III.

Courts normally accord great weight to an administrative interpretation of a statute unless it is clearly erroneous. (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 470, fn. 7 [14 Cal.Rptr.2d 514, 841 P.2d 1034]; *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 39 [115 Cal.Rptr.2d 151]; *City of Sacramento v. Public Employees Retirement System* (1991) 229 Cal.App.3d 1470, 1478 [280 Cal.Rptr. 847]; see *Bonnell v. Medical Bd. of California* (2003) 31 Cal.4th 1255, 1265 [8 Cal.Rptr.3d 532, 82 P.3d 740].) This is especially appropriate when, as here, the agency's interpretation is a product of its expertise and administrative experience. (*Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 929–930 [12 Cal.Rptr.3d 262, 88 P.3d 1]; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 22 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) Unlike the majority, I would follow PERS's interpretation of the statutory scheme because it is consistent with the Legislature's intent.

PERS, which has filed an amicus curiae brief, is the administrative agency charged with applying the provisions of the PERL. Under the statutory scheme, although the City of Anaheim made the determination of disability for Nolan as a local safety member (§ 21156), it is PERS that must determine disability "for most state employees and local non-safety employees" of contracting local agencies.

PERS has long read the PERL to require it to determine disability based on whether applicants are incapacitated to perform their actual usual duties. (See *In The Matter of Ruth A. Keck* (2000) Cal. PERS Bd. Admin., Precedential Dec. No. 00-05[2] ["In determining eligibility for disability retirement, the actual and usual duties of the applicant must be the criteria upon which any impairment is judged."].)

The majority dismisses the concerns of amicus curiae PERS, which will have to apply the majority's test, that a statewide test applicable to all California public employees with PERS coverage is "not administrable" because of the multiplicity of such public employers throughout the state. The majority seemingly has accepted the bland assurance of counsel for the city at

---

[2] This opinion is available at <http://www.calpers.ca.gov/eip-docs/about/leg- reg-statutes/board-decisions/past/00-05-keck.pdf> (as of July 1, 2004).

oral argument that "Everybody knows what a patrol officer does." But as amicus curiae PERS points out, although it may be possible to presume certain duties that "other police departments require of police officers," it cannot be presumed that "uniform circumstances of employment" exist in other cities and other public agencies statewide. PERS notes that "job classifications and descriptions from around the state for a certain position title would not describe identical duties." Thus, under the majority's holding PERS will be required to assume what duties are most frequently assigned to a given position in order to evaluate a particular employee's disability application. Applying such a generalized and speculative standard will result in an administrative nightmare, and, according to PERS, will prevent it from administering its retirement system fairly.

## IV.

The majority's holding is also contrary to over 30 years of decisions by California courts. In *Mansperger v. Public Employees' Retirement System* (1970) 6 Cal.App.3d 873 [86 Cal.Rptr. 450], a Court of Appeal decision, the applicant for disability retirement was a Fish and Game warden, that is, an employee of the State of California whose duties were defined in a job description applicable to all state game wardens. (*Id.* at pp. 874–875.) It was therefore relatively easy to determine whether the applicant's physical limitation on lifting heavy objects made him substantially unable to perform his actual usual duties as a State of California Fish and Game warden. (*Id.* at p. 876.) But when, as here, the applicant works for a local agency that has contracted with PERS, the job descriptions for positions with the same title will vary from local employer to local employer.

In *Hosford v. Board of Administration* (1978) 77 Cal.App.3d 854, 860–861 [143 Cal.Rptr. 760], the Court of Appeal concluded that an applicant's usual duties are not defined exclusively by a job's formal description or its physical requirements, but are determined in light of the actual demands of the job the applicant has been performing. (See *Thelander v. City of El Monte* (1983) 147 Cal.App.3d 736 [195 Cal.Rptr. 318] [usual duties test applied to injured trainee who as yet had no actual usual duties].)

Unlike the actual usual duties test, the majority's test is based on generic duties common to similarly titled jobs, and it disregards altogether the actual duties that the applicant was required to perform and for which the applicant may now be incapacitated.

## V.

Here the statutory language is clear. Read together, sections 20069 and 21156 reflect the Legislature's intent that an employee covered by PERS is

physically or mentally disabled when the employee is substantially unable to perform the actual and usual duties of the position he or she holds for the current employer. If that employer is the State of California, or a statewide entity such as the University of California, the usual duties of the applicant may be properly determined in part by reference to a job description applicable statewide. But if, as here, the employer is a local contracting agency the usual duties of the applicant are those required by the particular employer of the applicant. In either case the applicant's actual usual duties for the current employer are the correct standard for determining incapacity.

The majority, however, ignores the Legislature's intent as captured in the plain language of the statutes at issue. Instead it finds ambiguity where there is none. Even if the statutory language were ambiguous, moreover, a court must resolve any ambiguity in favor of the employee seeking disability retirement. (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 490 [66 Cal.Rptr.2d 304, 940 P.2d 891].) Here, there is no ambiguity in these statutes, apart from that the majority creates by not reading them carefully.

Today's decision is a serious matter for any law enforcement officer working for a local public agency in this state, or anyone considering a career in local law enforcement. It means that, to obtain a disability retirement, it is not enough that an officer is no longer able, because of physical or mental injury, to perform the duties assigned by the employing agency. Rather, a city or other local agency may deny a disability retirement if the officer *might* be able to perform the duties of a *roughly comparable* position for *some other* public agency *anywhere* in this large state. This result is not compelled by the governing statute, it is contrary to the statute's established administrative construction, and it imposes a heavy burden on injured employees. Our law enforcement officers deserve better.

I would reverse the Court of Appeal's judgment with directions to affirm the superior court's judgment granting petitioner the relief he seeks.

Werdegar, J., concurred.

Respondent's petition for a rehearing was denied September 1, 2004. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.