Filed 12/2/14  Thornburg v. Faunce CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHELLE THORNBURG, | |
| Plaintiff and Appellant, | G050299 |
| v. | (Super. Ct. No. RIC1104353) |
| EDWARD L. FAUNCE et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Riverside County, Daniel A. Ottolia, Judge.  Reversed.

Tetley Law Office and Frank O. Tetley for Plaintiff and Appellant.

Klinedinst PC, Heather L. Rosing, Leah A. Plaskin and Sarah H. Lanham for Defendants and Respondents.

Michelle Thornburg appeals from the summary judgment in favor of her former lawyers, Faunce, Singer & Oatman, APC (the Faunce Law Firm) and individual attorneys Edward L. Faunce, Mark Ellis Singer, and Jane H. Oatman (collectively referred to as the Defendants) in this legal malpractice action. Thornburg was a police officer for the City of Rialto (the City), and the Defendants represented Thornburg in her unsuccessful application for disability retirement benefits. The trial court concluded any alleged deficiency in the Defendants' representation of Thornburg did not cause her any harm because while her disability retirement application was pending she was fired for cause for a reason unrelated to her medical condition, which as a matter of law precluded her from receiving disability retirement benefits. We conclude the trial court erred and reverse the summary judgment.

FACTS

*Undisputed Background Facts*

The City hired Thornburg as a police officer in 1994. In 1997, she was suspended for 30 days without pay after being convicted of driving while under the influence of alcohol (DUI).

In November 1998, Thornburg injured her knee while on duty during pursuit of an armed robber. She initially was cleared to return to work in January 1999, but she soon felt unable to perform her required duties and was off work thereafter receiving further treatment. By July 1999, her doctor released her to return to work on modified duty. The City offered her a modified light duty position, which she accepted and she returned to work in a desk position in August 1999. Her duties thereafter largely involved driving to the courthouse, the district attorney's office, and juvenile court.

In November 1999, Thornburg prepared and submitted an application to the California Public Employees' Retirement System (CalPERS) for an industrial disability retirement. The form CalPERS industrial disability retirement application specifically directed that local safety members were *not* to describe the nature of their disability or

2

how it occurred, and accordingly, Thornburg did not describe her disability. In March 2000, Thornburg retained the Defendants to assist her with her disability retirement claim.

In July 2001, while she was driving on duty, Thornburg struck and killed an 82-year-old pedestrian. The victim apparently stepped in front of her car, and Thornburg was unable to brake in time. He flew over the hood of the car and smashed through the windshield in front of her. Thornburg received mental health treatment for emotional trauma from the accident. Sometime after the accident, Thornburg had surgery on her knee. Thereafter, she was taking numerous medications for pain and anxiety.

Thornburg never returned to work for the City, but remained on the City payroll for an additional year, receiving "4850 benefits."[1] During this time, Thornburg made a claim to the City for psychological injury arising from the car accident, specifically posttraumatic stress disorder that "manifested itself through shaking, nightmares, night sweats, seizures, passing out, memory loss, blurred vision, and blurred perception of reality."

On July 23, 2002, while still employed by the City and while her disability retirement application was still pending, Thornburg was arrested for another DUI.

On July 29, 2002, one of Thornburg's mental health providers issued a permanent and stationary report, stating she was a qualified injured worker. On August 5, 2002, the City's workers' compensation adjusting agency, referencing the July 2001 accident and the mental health provider's permanent and stationary report, advised Thornburg the City did not have a modified or alternate job for her within her job restrictions and invited her to participate in vocational rehabilitation services.

On August 7, 2002, and again on September 16, 2002, Faunce Law Firm attorney Oatman, wrote to the City demanding it make a decision on Thornburg's

---

[1] Labor Code section 4850 provides for police officers to receive leaves of absence for up to one year for temporary disability.

disability retirement application, which had now been pending for almost three years, reminding the City that Thornburg had suffered two industrial injuries: a psychiatric injury (from the July 2001 pedestrian fatality) and an orthopedic injury (from the November 1998 knee injury).

On September 25, 2002, the City's designated independent psychological evaluator sent the City his evaluation of Thornburg. The City's evaluator identified November 1998 (knee injury) and July 2001 (pedestrian fatality) as the dates of Thornburg's injuries. He described Thornburg's fragile emotional state at the time of his examination (September 2002) as including significant signs of clinical depression and anxiety. She had significant ongoing traumatic problems as a result of the July 2001 pedestrian fatality, which were exacerbated by having recently been sued by the family of the victim. She was unable to get the vision of the pedestrian smashing through her windshield out of her mind. She had nightmares, a constant feeling of her skin crawling, alternated between excessive sleep and inability to sleep, was easily provoked to tears and sobbing, was often afraid to leave her house or answer her phone. She had been placed on various antidepressants to no avail, and had two psychiatric hospitalizations.

The City's independent evaluator advised the City of his tentative opinion that Thornburg suffered posttraumatic stress disorder which he attributed 60 percent to the trauma of the July 2001 pedestrian fatality, 30 percent to the effects of now being sued by the family of the victim; and 10 percent to her July 2002 DUI. Although Thornburg was "NOT permanent and stationary," the City's evaluator opined she was temporarily partially disabled on a psychiatric basis and was not capable of resuming any work duties for the City, stating he doubted she would be ever able to work again for the City due to the emotional trauma from the July 2001 car accident. He stated Thornburg's "psychiatric injury/illness is considered a compensable industrial psychiatric injury resulting predominately from the effects of the [July 2001 pedestrian fatality]. I currently see no basis for apportionment of any ultimate psychiatric disability."

4

On November 14, 2002, the City notified Thornburg she was terminated for cause effective November 15, 2002, due to her violations of the law (two DUI arrests), and other "documented history of disobedience to the rules and regulations of this department for which [she had] received progressive levels of discipline." Thornburg was represented by a different law firm and lawyer in her disciplinary proceedings, and although she appealed her termination, she later withdrew that appeal.

By April 2003, the City still had not acted on Thornburg's disability retirement application, and Thornburg filed a petition for writ of mandate to compel the City to make a decision. On April 23, 2003, the city administrator denied Thornburg's petition for a industrial disability retirement. Although the letter referred to Thornburg's second industrial injury in July 2001 (i.e., her psychological injury due to the pedestrian fatality), it stated Thornburg was not incapacitated for performance of her duties in the position of police officer in a permanent modified light duty work position, she had been returned to a permanent modified light duty alternative employment on August 25, 1999, and was discharged for cause on November 15, 2002, for reasons unrelated to her medical status.

On April 29, 2003, Oatman filed an appeal of the city administrator's decision to CalPERS, again stating Thornburg had suffered *two* industrial injuries: orthopedic and psychiatric. In September 2003, Oatman filed a second writ of mandate to compel the City to issue a statement of issues so Thornburg's appeal could proceed to hearing before CalPERS.

In November 2003, the City submitted its statement of issues reiterating its position Thornburg was not incapacitated, had been offered modified light duty position following her 1998 knee injury, and because she was discharged for cause she could not receive a disability retirement. In December 2003, Oatman filed Thornburg's reply to the City's statement of issues and requested a hearing before an administrative law judge (ALJ). She reiterated that Thornburg's disability retirement application was based on

5

two injuries: the 1998 orthopedic injury and the psychiatric injury resulting from the 2001 pedestrian fatality. The City had never offered a modified duty that would address both injuries, and it acknowledged in August 2002, it could not offer her modified duty addressing both injuries.

Thornburg's appeal of the City's denial of her industrial disability retirement application was then derailed for several years, in part due to changes in criteria for assessing peace officer industrial disability retirement applications imposed by *Nolan v. City of Anaheim* (2004) 33 Cal.4th 335 (*Nolan*), and subsequent legislative efforts to address the appropriate criteria.[2] Eventually, the appeal was heard by an ALJ in August 2009, and Thornburg was represented at the hearing by Faunce. The ALJ's decision affirming the City's denial of Thornburg's disability retirement application was issued in February 2010 and adopted by the City.

In her decision, the ALJ mentioned the July 2001 pedestrian fatality and Thornburg's emotional injury resulting from that event. But she concluded Thornburg filed her disability retirement application in November 1999 following her orthopedic injury and never amended her application to include the 2001 injury or her mental condition. Therefore, the issues were limited to deciding whether Thornburg was permanently disabled or incapacitated when she filed her application for a disability retirement in November 1999. The ALJ denied Thornburg's industrial disability retirement application concluding the medical evidence was insufficient to establish that on November 8, 1999, the date Thornburg filed her application, her medical condition

---

[2] *Nolan*, *supra,* 33 Cal.4th 335, changed the criteria CalPERS historically applied for determining disability retirement by requiring a CalPERS member show he or she was substantially incapacitated from performing the usual duties of the position not just for his current employer but for any CalPERS-covered employer. Subsequent legislation confirmed CalPERS' historical practice that a member would be eligible for disability retirement provided he or she could show substantial incapacity to perform the usual duties required of his or her current employer. (See Assem. Bill No. 2244 (2006 Reg. Sess.) § 10.)

6

(i.e., her orthopedic injury) prevented her from performing the normal duties of a police officer. The City had given her a modified duty assignment with the same salary, same fringe benefits, and same promotional opportunities as other public safety employees. The ALJ's decision made no mention of the effect of Thornburg's termination for cause on her disability retirement application.

On November 22, 2010, the Defendants filed a petition for writ of mandate in the San Bernardino County Superior Court challenging denial of Thornburg's disability retirement application (hereafter the November 2010 Writ Petition). As will be explained below, Thornburg claims she was not informed the November 2010 Writ Petition was being filed, and she was led to believe by Faunce the ALJ's decision was the end of the road for her disability retirement application. The Defendants dispute this point.

Sometime after the ALJ issued her ruling, Thornburg learned she could withdraw her CalPERS contributions plus interest. On January 22, 2011, Thornburg filed a refund election form with CalPERS. On February 11, 2011, Thornburg received a letter from CalPERS, stating it could not process her refund request because she had also filed an application for retirement and she must either cancel her refund request, or cancel her application for retirement. The letter warned Thornburg her CalPERS membership would terminate as soon as a refund check was mailed and her right to any future benefits from CalPERS would terminate. Thornburg checked the box on the letter stating, "I wish to withdraw my appeal and cancel my application for Industrial Disability Retirement[,]" signed the letter, and returned it to CalPERS on February 14, 2011. On March 11, 2011, Thornburg received a retirement contributions refund check for about $58,000.

Thornburg did not consult with the Defendants before applying to withdraw her CalPERS contributions. Because she withdrew her CalPERS contributions, apparently, the November 2010 Writ Petition was dismissed.

7

*The Malpractice Complaint & Summary Judgment Motion*

Thornburg filed her malpractice action against the Defendants on March 8, 2011.  The complaint contained a single cause of action for legal malpractice.  It alleged Thornburg retained the Defendants to represent her "for all matters pertaining to her claim for an industrial disability retirement as a result of her inability to continue in her employment for the City."  It alleged the Defendants failed to conform to the applicable standard of care in rendering those legal services, and their negligence "consisted of, but was not limited to" the failure to amend Thornburg's industrial disability retirement application to include her mental condition; and their failure to adequately prepare for and present her evidence at the August 2009 hearing.

The Defendants moved for summary judgment on the grounds Thornburg could not prove damages for two reasons:  (1) Thornburg's termination for cause precluded her from receiving disability retirement benefits; and (2) by withdrawing her CalPERS contributions, Thornburg had waived any rights to disability retirement benefits.   The Defendants asserted but for the "insurmountable hurdles" posed by Thornburg's withdrawal of her CalPERS contributions and her termination for cause, she would most likely have prevailed on the November 2010 Writ Petition because the ALJ improperly limited Thornburg's claim to her orthopedic injury and refused to consider her emotional injury.

The Defendants' separate statement set forth the above undisputed facts concerning filing the November 2010 Writ Petition and Thornburg's application for a refund of her CalPERS contributions.  They asserted that when Thornburg withdrew her CalPERS contributions, she was aware she could no longer pursue industrial disability retirement benefits.  They also asserted Thornburg understood that when she was terminated for cause in November 2002, it rendered her ineligible for retirement benefits.

The Defendants' summary judgment motion was supported by declarations from Oatman and Faunce detailing various communications with the City, putting the

8

City on notice about Thornburg's emotional injuries from the July 2001 pedestrian fatality. Faunce declared he prepared and filed the November 2010 Writ Petition challenging the ALJ's decision. Both declared that although an employee's termination for cause "usually cuts off the right to retirement benefits, [the Defendants] continued to represent Thornburg in her application because [they] believed [they] could make a good faith argument for an extension, modification, or reversal of the existing law." They were not aware Thornburg intended to request a refund of her CalPERS contributions and "withdraw her appeal," and Thornburg never discussed those issues with them until after February 14, 2011.

The motion was also supported by excerpts from Faunce's deposition. Faunce testified at his deposition that after the ALJ's decision was issued, he spoke to Thornburg on the telephone, and she was crying—bordering on hysterical—during the conversation. He told Thornburg there was nothing more he could do with respect to the City, and they would have to seek relief in the superior court. He gathered from the conversation that Thornburg wanted him to file a petition for writ of mandamus, but he did not confirm the conversation in writing. He mailed Thornburg a retainer agreement on April 15, 2010, for pursuing a petition for writ of mandate, but Thornburg never returned it and he never followed up with her. Nonetheless, he filed the November 2010 Writ Petition to protect Thornburg's rights. Faunce testified he spoke with Thornburg after he heard she was going to withdraw her CalPERS contributions. He told her that if she took her money out they could not pursue the petition for writ of mandate. She said "that's fine. She understood."

The Defendants also included excerpts from Thornburg's deposition at which she testified she was aware if she withdrew her CalPERS contributions she could no longer pursue her disability retirement application. Moreover, Thornburg testified had she known earlier she could have withdrawn her contributions, she would have because of the extreme financial distress she was under. When asked if she ever intended to

9

appeal she replied, "No." Thornburg testified she never authorized the Defendants to file the November 2010 Writ Petition. Thornburg testified she knew getting fired for cause meant she would not be entitled to disability benefits, but what she did not know when she was fired was that she could have obtained a refund of her contributions. "I didn't know that money was in there. I thought that when I got fired all the money was gone."

Thornburg acknowledged at her deposition that she received an April 15, 2010, letter from Faunce Law Firm attorney Singer with a retainer agreement referring to a petition for writ of mandate, but because Faunce had already told her there was nothing more that could be done, she figured it was a waste of time. She never followed up because at that point she just did not want to go through it anymore. Thornburg testified she finally talked to Singer on February 3, 2011, and he told her the Defendants had filed the November 2010 Writ Petition. He sent her another retainer agreement. At first Thornburg was really excited, but by the time she received the retainer agreement she realized she had already sent her refund application and she knew withdrawing her contributions would cut off her rights to any disability benefits so she did not sign the new retainer agreement.

Thornburg's opposition to the summary judgment motion largely argued there were material issues of fact as to causation. In short, Thornburg contended she had been unaware of her right to a judicial challenge to the ALJ's adverse determination, and was unaware the November 2010 Writ Petition had been filed until after she withdrew her CalPERS contributions. Thornburg also argued her termination for cause did not make her ineligible for industrial disability retirement benefits as a matter of law because she had a valid claim for benefits *before* she was fired.

Thornburg's opposition was supported by her declaration. She described various retainer agreements with the Defendants, which covered different parts of the disability retirement and workers' compensation procedure, and which provided for contingent fees based in part on the amount of retroactive monies awarded, with some

10

fees being payable up front. After the City denied her benefits in 2003, Thornburg signed a retainer agreement with the Defendants for the administrative appeal to the ALJ. The retainer agreement called for payment of a $7,500 retainer fee that would be credited towards a contingent fee based on her total recovery. Thornburg declared that after she mailed the signed retainer agreement back to the Defendants, she received back a copy of her credit card receipt for $8,000.[3]

Thornburg described receiving a retainer agreement from the Defendants dated April 15, 2010, and another dated February 3, 2011, both of which referred to filing and pursuing a petition for writ of mandate in the superior court. Thornburg declared that during the ALJ hearing, Faunce told her she would win, and she was devastated when she lost. She declared Faunce called her and "said he was sorry, but that was all they could do for me. [¶] He didn't tell me about any appeal, let alone [that] we would win it because of the mistake of the [ALJ]." She declared Faunce did not explain the appeal to her. Attorney Singer called her in February 2011 and told her they had filed an appeal, but she had already requested a refund of her CalPERS contributions.

Thornburg's opposition was also supported by a declaration from an expert witness, attorney Brian C. Unitt. He opined the Defendants were negligent in failing to adequately advise Thornburg about her right to challenge the unfavorable ruling by the ALJ. Although Faunce testified at his deposition that he told Thornburg they could file a petition for writ of mandate challenging the ALJ's decision, there was no written confirmation Thornburg was advised of that possibility. Thornburg testified Faunce said the case was over and nothing more could be done, and Faunce conceded Thornburg was

---

[3] The Defendants submitted a reply declaration of Faunce stating the only payment Thornburg ever made to the Defendants was the initial $500 retainer fee, and she never made a $8,000 payment. He attached billing invoices showing that in addition to the $500 retainer fee, the only other compensation the Defendants received was a payment of $3,284.50 from the City following the successful first petition for writ of mandate in 2003.

11

crying and bordering on hysterical during the conversation. Faunce did not inform Thornburg he was filing a petition for writ of mandate on her behalf. Accordingly, Thornburg was unaware of what she was giving up when she requested a refund of her CalPERS contributions. Faunce never warned Thornburg about the consequences of seeking a refund of her CalPERS contributions. Unitt also criticized the Defendants for having continued to pursue Thornburg's disability retirement application after she was terminated for cause in view of their position that termination precluded her from qualifying for any such benefits. Taking fees from a client to pursue a claim the lawyers knew had no merit was a breach of their fiduciary duties. Finally, Unitt criticized the Defendants for having created a conflict with Thornburg via the contingent fee agreement based on retroactive monies awarded to her—i.e., the longer the industrial disability retirement application process took, the higher those potential retroactive disability payments.

Two days after filing her opposition to the summary judgment motion, Thornburg filed an ex parte application to shorten time to hear a motion to file an amended complaint. The proposed amended complaint attached to the motion to shorten time expanded the alleged negligent acts to include the Defendants' failure to appropriately advise Thornburg about the scope of their representation, that she should not withdraw her CalPERS contributions, and that her termination for cause precluded an award of disability retirement benefits. It also contained allegations the Defendants failed to disclose the conflict created by the retainer agreements and that delay in pursuing Thornburg's disability retirement application could increase the fees payable to the Defendants. The application to shorten time was denied. The register of actions indicates Thornburg filed a motion for leave to amend the complaint on the day the summary judgment motion was heard and hearing on the motion was subsequently vacated.

12

*Ruling*

The trial court granted the Defendants' motion for summary judgment, finding that as a matter of law Thornburg's termination for cause prior to her having obtained "a matured right to a disability retirement benefit . . . precluded [her] from receiving a disability retirement benefit from the City." Accordingly, Thornburg could not show causation, i.e., that she would have had a better result but for the Defendants' alleged negligence. In view of that ruling, the trial court declined to decide if Thornburg's withdrawal of her CalPERS contributions also precluded her from proving damages.

DISCUSSION

A. *Summary Judgment in a Legal Malpractice Case*

A motion for summary judgment is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and decide independently whether the undisputed facts warrant judgment for the moving party as a matter of law. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.)

To state a cause of action for legal malpractice, a plaintiff must plead "(1) the duty of the attorney to use such skill, prudence, and diligence as members of his or her profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the breach and the resulting injury; and (4) actual loss or damage resulting from the attorney's negligence. [Citations.]" (*Coscia v. McKenna & Cuneo* (2001) 25 Cal.4th 1194, 1199-1200.)

The sole basis on which the Defendants sought summary judgment was Thornburg's inability to prove their alleged negligence caused her any injury. To establish causation in a legal malpractice action, the plaintiff is required to prove, but for the defendants' negligent acts or omissions, he or she "would have obtained a more

13

favorable judgment or settlement in the action in which the malpractice allegedly occurred." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1241 (*Viner*).) This requirement, intended to safeguard "against speculative and conjectural claims," essentially requires a "trial-within-a-trial" of the underlying case. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 834 (*Mattco Forge*) [trial-within-a-trial "is a standard of proof designed to limit damages to those actually *caused* by a professional's malfeasance"]; accord, *Viner*, *supra,* 30 Cal.4th at p. 1241.) "The trial-within-a-trial method does not 'recreate what a particular judge or fact finder would have done. Rather, the jury's task is to determine what a reasonable judge or fact finder would have done . . . . '" (*Mattco Forge, Inc., supra,* 52 Cal.App.4th at p. 840.)

"Causation is generally a question of fact for the jury, unless reasonable minds could not dispute the absence of causation. [Citations.]" (*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666; *Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 864 [causation "is ordinarily a question of fact which cannot be resolved on summary judgment" unless "under undisputed facts, there is no room for a reasonable difference of opinion"].) However, causation is a question of law for the court in a legal malpractice action if the issue hinges on a question of law that would have been determined by the trial court in the underlying action. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 970.)

*B. Material Issues of Fact as to Whether Thornburg's Termination for Cause Precluded an Award of Disability Retirement Benefits*

Whether Thornburg's termination for cause would have precluded a reasonable trial judge from ruling in her favor on the November 2010 Writ Petition is the central issue in this appeal. The trial court, agreeing with the Defendants, found that as a matter of law Thornburg's termination for cause precluded her from obtaining disability retirement benefits and thus she could not prove the Defendants' alleged negligence caused her any damage. We conclude there are material issues of fact as to the effect of

14

Thornburg's termination for cause on her application for disability retirement and, thus, on whether she suffered any harm as a result of the Defendants' alleged negligence.

We begin with the relevant statutes regarding a public safety employee's disability retirement benefits. A city may contract with CalPERS for purposes of providing a retirement system. (Gov. Code, § 45345.)[4] Section 21151, subdivision (a), provides, "Any . . . local safety member incapacitated for the performance of duty as the result of an industrial disability shall be retired for disability . . . regardless of age or amount of service."[5] When a local safety member applies for disability retirement, the governing board of the agency determines in the first instance whether the member is incapacitated for the performance of duty (§ 21154), and is required to act on the employee's application within six months of receipt (§ 21157). The employee may appeal the local agency's decision to CalPERS and is entitled to an administrative hearing before an ALJ. (§ 21156, subd. (b)(2).) The local agency then can take action on the ALJ's decision, such as adopting it, rejecting it, or modifying it (§ 11517, subd. (c)(2)), and judicial review of the local agency's final decision may be had via administrative mandamus (Code Civ. Proc., § 1094.5; *Gong v. City of Fremont* (1967) 250 Cal.App.2d 568, 572). A trial court would be required to exercise its independent judgment in such a review. (*Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1452 [independent judgment in reviewing city's decision involving employee's "'fundamental vested right to a disability retirement pension if he in fact was disabled'"]; see also *Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 198 (*Smith*) [agency decision

---

[4]     All further statutory references are to the Government Code, unless otherwise indicated.

[5]     An "industrial disability" results from an "injury or disease arising out of and in the course of [the employee's] employment." (§ 20046.) "Disability" means an "inability to engage in any substantial gainful occupation by reason of any physical or mental impairment." (§ 20027.)

15

denying disability retirement involves fundamental vested rights of employee requiring independent review of administrative record to determine if weight of evidence supports agency's findings].)

Section 21156, subdivision (a)(1), sets forth the requisite conditions for approving a disability retirement. It provides in relevant part, "If the medical examination and other available information show to the satisfaction of . . . the governing body of the contracting agency employing the member, that the member . . . is incapacitated physically or mentally for the performance of his or her duties *and is eligible to retire for disability*, the board shall immediately retire him or her for disability . . . ." (Italics added.)

Section 21156, subdivision (a)(1)'s proviso that the member must be "eligible to retire for disability" gives rise to the issue presented here because the statute does not define what it means to be "eligible to retire for disability." *Haywood v. American River Fire Protection Dist.* (1998) 67 Cal.App.4th 1292 (*Haywood*), and *Smith, supra,* 120 Cal.App.4th 194, the cases upon which the Defendants and the trial court relied, guide the analysis.

In *Haywood*, a firefighter who was frequently disciplined for failing to follow directions applied for workers' compensation benefits claiming "psychic injury" resulted from his fear of constant scrutiny by supervisors in the fire district. (*Haywood, supra,* 67 Cal.App.4th at p. 1299.) Doctors evaluated the firefighter. He was eventually charged with jeopardizing the health and safety of the public and inexcusable neglect of duty and was terminated from employment. Almost a year after being fired, the firefighter applied for disability retirement and his application was denied by the fire district—a decision that was upheld in an administrative hearing. (*Ibid.*) In the ensuing administrative mandamus proceeding, the trial court found the firefighter was disabled and directed the fire district to set aside its administrative decision denying his disability retirement application. (*Id.* at pp. 1302, 1308.)

16

On appeal, the court in *Haywood, supra,* 67 Cal.App.4th 1292, reversed the trial court and held the firefighter was not eligible for disability retirement. (*Id.* at pp. 1303, 1308.) Among the variety of reasons for its conclusion, the *Haywood* court interpreted various statutes as requiring a person may only be eligible for disability retirement if the person would be permitted to return to work if the disability were alleviated. (*Id.* at p. 1305.) Because the firefighter was terminated for cause from his job, there was no longer the potential of him being reinstated as a firefighter with the fire district, and therefore his application for disability retirement must be denied. (*Id*. at p. 1306.) Additionally, the *Haywood* court noted that awarding the firefighter "disability retirement would interfere with the [fire district's] authority to discipline recalcitrant employees. Such an award in effect would compel the [fire district] to pension-off an employee who has demonstrated unwillingness to faithfully perform his duties, and would reward [the firefighter] with early retirement for his recalcitrance. [¶] In other words, granting [the firefighter] disability retirement would override [his] termination for cause despite his inability to set aside the termination through the grievance process." (*Ibid.*) Therefore, the court reasoned the firefighter's disability retirement application should be rejected so that the fire district's authority to discipline was not overridden. (*Ibid.*) In sum, the *Haywood* court "conclude[d] that where . . . an employee is fired for cause *and the discharge is neither the ultimate result of a disabling medical condition nor preemptive of an otherwise valid claim for disability retirement*, the termination of the employment relationship renders the employee ineligible for disability retirement regardless of whether a timely application is filed." (*Id*. at p. 1307, italics added.)

Several years later, the same court in *Smith, supra,* 120 Cal.App.4th 194, elaborated on *Haywood*. In *Smith*, a city firefighter suffered a back injury on the job for which he had received a partial (15 percent) permanent disability rating, but over the next nine years of employment he had ongoing disciplinary issues. (*Smith*, *supra*, 120 Cal.App.4th at p. 199.) As part of those disciplinary issues, he was required to

17

complete various certification tests.  (*Id.* at pp. 199-200.)  After making critical errors during one of the tests, the firefighter was terminated from employment.  On the effective date of his dismissal, the firefighter filed a claim for disability retirement.  (*Id*. at p. 201.)  Relying on *Haywood*, the city concluded the firefighter was ineligible for disability retirement due to his dismissal from his job, and its decision was affirmed in an administrative hearing.  (*Smith*, *supra,* 120 Cal.App.4th at pp. 201-202.)

In affirming the trial court's denial of the firefighter's petition for writ of administrative mandamus, *Smith* explained *Haywood* held that "if an applicant is no longer eligible for [job] reinstatement because of a dismissal for cause, this also disqualifies the applicant for a disability retirement.  [Citation.]"  (*Smith*, *supra,* 120 Cal.App.4th at p. 203.)  However, the *Smith* court explained the *Haywood* "holding would not apply where the cause for dismissal was the result of a disabling medical condition, *or where the dismissal would be 'preemptive of an otherwise valid claim for disability retirement.'*  [Citation.]"  (*Smith*, *supra*, 120 Cal.App.4th at p. 205, italics added.)  *Smith* explained, "even if an agency dismisses an employee *solely* for a cause *unrelated* to a disabling medical condition, [such a dismissal] cannot result in the forfeiture of a *matured right* to a pension absent express legislative direction to that effect.  [Citations.]  Thus, if a plaintiff were able to prove that the right to a disability retirement *matured* before the date of the event giving cause to dismiss, the dismissal cannot preempt the right to receive a disability pension for the duration of the disability.  [Citation.]  Conversely, the 'right may be lost upon occurrence of a condition subsequent such as lawful termination of employment before it matures . . . .'  [Citation.]"  (*Id*. at p. 206, third & fourth italics added.)

Applying the *Haywood* rules, the *Smith* court concluded the key issue before it was whether the firefighter's right to a disability retirement had "matured" before his termination.  (*Smith*, *supra*, 120 Cal.App.4th at p. 206.)  *Smith* concluded a "vested right matures when there is an unconditional right to immediate payment.

18

[Citations.]" (*Ibid.*)  It concluded a duty to provide a disability pension payment only arises once the pension board determines the employee is no longer capable of performing his or her duties.  In other words, a right to a pension payment is "matured" once the pension board approves the employee's disability retirement application.  If a plaintiff were able to prove the pension board determined he was no longer capable of performing his duties before the date of the event giving cause to dismiss, then dismissal could not preempt the right to receive a disability pension for the duration of the disability.  Accordingly, *Smith* concluded that because "a CalPERS determination of eligibility did not antedate the unsuccessful certification [test, the firefighter's] right to a disability retirement was . . . immature, and his dismissal for cause defeated it." (*Ibid.*)[6]

Although *Smith* held the firefighter's right to a disability retirement had not matured before he was terminated for cause, it articulated exceptions to its holding. (*Smith, supra,* 120 Cal.App.4th at pp. 206-207 ["there may be facts under which a court, applying principles of equity, will deem an employee' s right to a disability retirement to be matured and thus survive a dismissal for cause"].)  The first would be "if the plaintiff had an impending ruling on a claim for a disability pension that was delayed, through no fault of his own, until after his dismissal." (*Id.* at p. 207.)  However, that possible exception was not implicated in *Smith* because the firefighter "did not even initiate the process until after giving cause for his dismissal." (*Ibid.*)  The second exception would be when "there [was] undisputed evidence that the plaintiff was eligible for a CalPERS disability retirement, such that a favorable decision on his claim would have been a foregone conclusion (as perhaps with a loss of limb)." (*Ibid.*)  However, *Smith* concluded

---

6        Although *Smith* referred to the firefighter's failing the certification test as the critical event, in a footnote, it observed, "[n]either the facts nor the briefing in the present case require us to decide whether the event extinguishing a right to a disability retirement is the effective date of the dismissal, the date of the decision to dismiss the employee, or the date of the underlying conduct giving cause for the dismissal." (*Smith*, *supra*, 120 Cal.App.4th at p. 206, fn. 11.)

19

that equitable exception did not apply because the firefighter's medical evidence was equivocal. (*Ibid*.)

We conclude there are material issues of fact as to whether Thornburg's termination for cause before her disability retirement application was acted on by the City precluded her disability retirement claim. Accordingly, the trial court erred by concluding as a matter of law Thornburg could not prove she was damaged by any alleged negligence of the Defendants in representing her in the underlying disability matter.

There are facts from which a reasonable trial court on a petition for writ of administrative mandamus could conclude the equitable exceptions articulated in *Smith*, *supra*, 120 Cal.App.4th 194, should apply in this case because there is evidence of both inexplicable delay by the City on Thornburg's long-pending disability retirement application until *after* she was fired for cause and evidence a favorable decision on her application would have been a foregone conclusion had she not been terminated for cause.[7] This is not a case like *Haywood* or *Smith* in which the employee's disability claim was in response to or in anticipation of a looming termination for cause. Thornburg filed her disability retirement application in November 1999, following her 1998 work-related knee injury. In July 2001, she was involved in an on-duty car accident in which an elderly man was killed, following which she never returned to work in large

---

[7] In view of this conclusion, we need not consider Thornburg's extensive reliance on an ALJ decision issued June 12, 2003, in *Plein v. Department of Corrections* (OAH No. N 2002060499), which predates *Smith*. In that case, an employee prison guard's disabling orthopedic injury (arm and elbow injured in altercation with an inmate) occurred before his termination for cause (following arrest for being under the influence of narcotics), and his disability application was filed *after* his termination. Nonetheless, the ALJ concluded the employee had a valid claim for disability retirement because his disabling injury preceded his termination.

Nor do we consider Thornburg's argument concerning whether the City should have granted her a disability retirement based solely on her knee injury or whether the City's placing her on modified duty following that injury was appropriate.

20

part due to the emotional trauma from that event. There is evidence from which a trial court could find the City was fully apprised of Thornburg's psychological condition, that she was receiving psychological treatment and was on temporary disability as a result. On July 29, 2002, just a few days after Thornburg's DUI arrest, and several months before her termination, the City received a permanent and stationary report from one of Thornburg's mental health provider stating she was a qualified injured worker. Within days of that, the City's workers' compensation adjusting agency, specifically referencing the July 2001 accident and the mental health provider's permanent and stationary report, advised Thornburg the City did not have a modified or alternate job for her within her job restrictions and invited her to participate in vocational rehabilitation services. On September 25, 2002, the City received its own independent psychological evaluation of Thornburg opining she was disabled on a psychological basis and the psychiatrist stated he doubted she would be ever able to work again for the City due to the emotional trauma from the July 2001 car accident. The City did not terminate Thornburg until November 15, 2002. And despite the statutory requirement a disability retirement application be decided within six months (§ 21157), the City did not act on Thornburg's application until April 2003—and only then after the Defendants filed a petition for writ of mandate to compel the City to make a decision. Moreover, the City's finding Thornburg was not disabled was apparently based only on her knee injury because even though its denial letter referred to the July 2001 accident, it found she was not disabled because she could and did return to modified light duty in August 1999—two years earlier.

The City's delay in acting on Thornburg's retirement application was then compounded by inordinate delay—another six and one-half years—before she received an administrative review hearing before the ALJ. Some of that delay was likely attributable to the City (it took a second petition for writ of mandate to compel the City to issue a statement of issues so Thornburg's appeal could proceed to hearing before

21

CalPERS); some of the delay was apparently attributable to a change in law effected by *Nolan, supra,* 33 Cal.4th 335, and subsequent legislative changes; and some of the delay remains entirely unexplained.

That Thornburg's disability application was eventually heard and denied by the ALJ does not alter the conclusion there is evidence from which a trial court exercising its independent judgment on a petition for writ of mandate could have found the exceptions articulated in *Smith* applied. Despite Thornburg's statement of issues specifically identifying emotional injuries resulting from her 2001 on the job accident as one of her disabilities, the ALJ refused to consider those injuries in deciding if she was disabled. The ALJ concluded Thornburg was required to amend her disability application to specifically identify that injury for it to be considered, and failed to do so. Thus the only issue was whether she was disabled on the date of her application, i.e., from her knee injury. As the Defendants specifically argued in their summary judgment motion, the ALJ erred in refusing to consider Thornburg's emotional injuries. The disability application form specifically precludes a local safety member from specifying their disability or how it occurred. Moreover, the issue is not what was on Thornburg's application, but what information the City had notice of when it acted on the application.

For example, in *Thompson v. City of San Diego* (1987) 43 Cal.3d 1033, 1039, the Supreme Court held a city violated a public safety employee's due process rights by denying him a hearing on his application for disability retirement on the grounds the knee injury identified on his application occurred before the employee became eligible for a disability retirement. The employee had a separate psychological injury that occurred after he became a member of the retirement system. The city had been kept fully apprised of both the employee's physical and psychological conditions, that he was under a psychiatrist's care, and that he had applied for industrial/injury leave, and the employee's medical records and the reports of his treating psychiatrist were reviewed by a psychiatric specialist at the city's request. The Supreme Court held that

even though the employee's pension application did not identify psychological injury as a cause of his disability, the application was not to be judged under the kinds of standards applied to legal pleadings and "the city was sufficiently placed on notice of a separate psychological basis for plaintiff's disability retirement claim." (*Ibid.*) Here, there is abundant evidence the City was well aware of Thornburg's emotional injury was a basis for her disability claim long before it terminated her and long before it acted on her disability retirement application.

In sum, we conclude there are material issues of fact as to whether Thornburg's termination for cause precluded her from obtaining a disability retirement because there are facts from which a trial court on a petition for writ of administrative mandamus in the disability matter could find the exceptions articulated in *Smith*, *supra*, 120 Cal.App.4th 194, applied. Accordingly, the trial court in this legal malpractice action against her attorneys erred in concluding that as a matter of law, Thornburg could not prove damages resulting from their alleged negligence in handling her case.

## C. *Effect of Thornburg's Withdrawal of CalPERS Contributions on Causation*

The second ground for the Defendants' summary judgment motion again challenged causation. They argued that by withdrawing her CalPERS contributions, instead of permitting them to pursue the November 2010 Writ Petition, Thornburg waived her claim for CalPERS retirement benefits. And because Thornburg is now precluded from obtaining disability retirement benefits, she cannot prove any damages due to any negligence by the Defendants. The trial court declined to decide this issue.

We conclude there are material issues of fact as to whether Thornburg's withdrawal of her CalPERS contributions precludes her from proving she was damaged by the Defendants' alleged negligence. Whether there has been waiver is a question of fact. (*Howell v. Courtesy Chevrolet, Inc.* (1971) 16 Cal.App.3d 391, 405.) A waiver must be voluntary, knowing, and done with adequate awareness of the relevant

23

circumstances and likely consequences. (*Bauman v. Islay Investments* (1973) 30 Cal.App.3d 752, 758.)

Thornburg's complaint alleged the Defendants were retained to represent her in "all matters pertaining to her claim for an industrial disability retirement," which reasonably included the administrative hearing proceeding and possible judicial challenges to its result.[8] Thornburg's opposition to the Defendants' summary judgment motion included a declaration from an attorney expert witness opining the Defendants

---

[8] Thornburg raises as a separate, somewhat confusing argument that "if" summary judgment were granted because her complaint was insufficiently pleaded, then she should have been permitted to amend her complaint. But the Defendants did not move for summary judgment based on inadequacy of the pleadings. The Defendants respond with the familiar rule that, "'The pleadings delimit the issues to be considered on a motion for summary judgment. [Citation.]' [Citation.] Thus, a 'defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers.' [Citation.]" (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1253.) We can only assume the import of these arguments from the Defendants' standpoint is that facts asserted in Thornburg's opposition to the summary judgment motion (and her expert's declaration) regarding the Defendants' alleged failure to adequately advise her on or pursue judicial review of the denial of disability retirement benefits, or to warn her about the consequences of withdrawing her CalPERS contributions, were outside the scope of her complaint. Thornburg's complaint alleged she retained the Defendants to represent her "for *all matters* pertaining to her claim for an industrial disability retirement as a result of her inability to continue in her employment for the City" (italics added), and they failed to conform to the requisite standard of care in rendering those legal services. She alleged the negligence "consisted of, but was not limited to" the failure to amend Thornburg's industrial disability retirement application to include her mental condition; and their failure to adequately prepare for and present her evidence at the August 2009 hearing before the ALJ. Those allegations could reasonably encompass post-ALJ hearing activities. (*Sadlier v. Superior Court* (1986) 184 Cal.App.3d 1050, 1055 ["The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings"].) But the issues before us now are not whether the Defendants *breached* their duties. The sole ground for the summary judgment motion was whether Thornburg could prove causation in view of her termination for cause and her withdrawal of her CalPERS contributions.

24

failed to adequately advise Thornburg about her right to mount a judicial challenge to the unfavorable ruling from the ALJ and did not adequately inform her about the writ petition they had filed on her behalf. Thus, Thornburg would not have understood what she was giving up when she requested a refund of her CalPERS contributions.

Thornburg declared that after the ALJ's decision came out, Faunce called her and "said he was sorry, but that was all they could do for me. [¶] He didn't tell me about any appeal, let alone [that] we would win it because of the mistake of the [ALJ]." She declared Faunce did not explain her judicial review options to her. Although the Defendants provided Thornburg's deposition testimony to the effect that after she learned of the ALJ's decision, she did not want to appeal, but just wanted to be done with the case, in view of evidence of her significant emotional distress a trier of fact could conclude she did not understand her appeal rights. And her testimony that had she known earlier she could have withdrawn her contributions, she would have done so because of the financial distress she was under, does not compel the conclusion she understood her judicial review options and knowingly gave them up. Thornburg admitted she received a retainer agreement referring to a petition for writ of mandate two months after she spoke with Faunce but did not understand what it referred to in view of Faunce's statement the matter was done. The Defendants provided Faunce's contrary deposition testimony—that he discussed filing a petition for writ of mandate with Thornburg—but he agreed she was crying and bordered on hysterical during the conversation. He never confirmed the conversation in writing, and although he mailed out a retainer agreement on April 15, 2010, he never followed up on why Thornburg had not returned it.

Thornburg declared it was not until she spoke to Singer on February 3, 2011, after she had applied for a refund of her CalPERS contributions, that she learned the November 2010 Writ Petition had been filed. Faunce testified he spoke to Thornburg on the phone *after* he learned she had completed the paperwork to withdraw her CalPERS contributions and told her that if she took her money out she could not pursue a writ

25

petition, and Thornburg said that was fine, but there is no indication as to whether at that point, Thornburg could have halted the refund process. Although Thornburg signed the second CalPERS letter, checking the box stating, "I wish to withdraw my appeal and cancel my application for Industrial Disability Retirement[,]" after she learned from Singer the November 2010 Writ Petition had been filed, it does not necessarily follow that a layperson would understand "appeal" to mean dismissal of the November 2010 Writ Petition. In sum, we conclude there is a triable issue of fact as to whether Thornburg understood her judicial review options after losing before the ALJ, and thus whether she understood what she was giving up when she withdrew her CalPERS contributions.

DISPOSITION

The judgment is reversed. Appellant is awarded her costs on appeal.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.


26